NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-11862

COMMONWEALTH  vs.  RICHARD J. ST. LOUIS.


Berkshire.      September 8, 2015. - December 23, 2015.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, &
Hines, JJ.


Indecent Assault and Battery on a Person with an Intellectual
    Disability.  Indecent Assault and Battery on a Retarded
    Person.  Indecent Exposure.  Intellectually Disabled
    Person.  Mentally Retarded Person.  Constitutional Law,
    Vagueness of statute, Assistance of counsel, Ex post facto
    law.  Due Process of Law, Vagueness of statute.  Practice,
    Criminal, Instructions to jury, Required finding, New
    trial, Assistance of counsel.  Consent.



    Indictments found and returned in the Superior Court
Department on October 24, 2011.

    The cases were tried before John A. Agostini, J., and a
motion for a new trial was considered by him.

    The Supreme Judicial Court on its own initiative
transferred the case from the Appeals Court.


    Michael J. Hickson for the defendant.
    John P. Bossé, Special Assistant District Attorney, for the
Commonwealth.

SPINA, J.  In this case, we are asked to examine whether the term "intellectual disability" in G. L. c. 265, § 13F (indecent assault and battery on a person with an intellectual disability), renders the statute unconstitutionally vague.  On the effective date of November 2, 2010, the Legislature amended the statute substituting the term "mentally retarded person" with "person with an intellectual disability" as well as the words "be mentally retarded" with "have an intellectual disability."  St. 2010, c. 239, §§ 71-72.  These amendments were part of a broad legislative scheme that purged the term "mentally retarded" from the General Laws.  St. 2010, c. 239 ("An Act eliminating the word 'retardation' from the General Laws").  As a result, G. L. c. 265, § 13F, now states: "Whoever commits an indecent assault and battery on a person with an intellectual disability knowing such person to have an intellectual disability shall . . . be punished . . . ."  The term "intellectual disability" is not defined by the statute.

The defendant was convicted on four indictments alleging indecent assault and battery on a person with an intellectual disability,[1] one indictment alleging indecent exposure, and one

---

[1] One indictment involved the touching of the defendant's penis by the victim.  A second involved the defendant touching the victim's vagina with his hands.  A third involved the defendant touching the victim's breast with his hands.  The fourth involved the defendant touching the victim's breast with

indictment alleging accosting or annoying a person of the opposite sex. The crimes were alleged to have occurred between on or about January 1, 2008, which was before the effective date of the statutory amendments, and on or about September 16, 2011.

At the close of the Commonwealth's evidence, the defendant moved for required findings of not guilty on all charges. A judge in the Superior Court entered a required finding of not guilty on an indictment alleging intimidation of a witness but denied the motion as to the remaining charges.

At the close of all the evidence, the defendant renewed his motion for required findings of not guilty on the remaining charges, which was denied. Appellate proceedings were stayed to allow the defendant to file postconviction motions. The defendant filed postconviction motions for a new trial under Mass. R. Crim. P. 30 (b), as appearing in 435 Mass. 1501 (2001),[2] and for a required finding of not guilty under Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995),[3] both of which

---

his mouth. The jury found him not guilty on a fifth indictment involving evidence that he put his mouth on the victim's vagina.

[2] In his motion for a new trial, the defendant alleged that counsel was ineffective for failing to file a motion to dismiss the indictments charging indecent assault on a person with an intellectual disability on grounds that the statute was unconstitutionally vague, and that he had been charged under an ex post facto law.

[3] In his postconviction motion for required findings of not guilty, the defendant alleged that the evidence was insufficient

were denied by the trial judge.  The defendant appealed from the denial of his postconviction motions.  The Appeals Court consolidated the two appeals.  We transferred the case to this court on our own motion.

On appeal, the defendant asserts (1) that the term "intellectual disability" renders G. L. c. 265, § 13F, unconstitutionally vague; (2) that he was convicted under an ex post facto law; (3) that the judge erred by denying certain of his motions for a required finding of not guilty; and (4) that the judge erred by denying his motion for a new trial.  For the following reasons, we conclude that G. L. c. 265, § 13F, is constitutional, and we affirm the judge's rulings.

1.  Background.  The jury could have found the following facts.  In 2013, at the time of trial, Amy[4] was a twenty-four year old woman.  At the time of the incidents, Amy lived in a farmhouse with a wraparound porch in Hancock with her mother and her maternal grandfather.  She was adopted at birth, and at the age of eight months she was diagnosed with "slow learning" and "special needs."  Amy reads at a third or fourth grade level and has a verbal intelligence quotient (IQ) of forty-seven.  In

_____

to warrant convictions on the indictments charging him with indecent assault and battery on a person with an intellectual disability, and that he had been charged under an ex post facto law.

[4] A pseudonym.

2008, after Amy reached age eighteen, her mother and grandfather were appointed legal guardians of her. According to the permanent decree of guardianship admitted in evidence, a judge in the Probate and Family Court found that Amy is "mentally retarded" and that failure to appoint a guardian would create risk to her health and welfare. The medical certificate supporting the permanent decree of guardianship details Amy's disability as being mental retardation and states that she lacks the ability to make decisions without adult supervision.[5]

At the time of trial, the defendant was seventy-two years old. He is a retired boat builder, which he had done for forty-six years, but he continued to work part time doing fiberglass work. His hobbies included hunting and fishing. He and a friend used to hunt in western Massachusetts. The friend introduced him to Amy's great grandmother. In the early 1980s, he began to hunt on the property where Amy and her family live. The defendant and Amy's grandfather forged a friendship and grew close over the years. The defendant would visit the family two to three times a year and hunt on the property. He typically would stay for one or two weeks at a time in his camper, which

---

[5] The medical certificate also reports that Amy's most recent evaluations at the time illustrated her problem-solving ability to be at a four year old level.

he parked behind the farmhouse.  The defendant came to know Amy, and he described her as behaving "like a child more or less."

On September 11, 2011, Amy and the defendant were sitting side by side, alone on the porch.  The boy friend of Amy's mother was folding laundry in front of a window overlooking the porch.  While sitting next to the defendant, Amy dropped her hand to his leg and slowly moved her hand up toward the defendant's crotch area.  Amy began to "rub" and "pet" the defendant's penis over his pants.  Amy testified that the defendant did not ask her to do this but that it was "his idea." Amy's mother's boy friend watched this occur from the window, and after watching for a few moments, he went to the staircase and called up to Amy's mother to come downstairs.  She and her boy friend watched Amy and the defendant from the downstairs window.  Amy's mother saw Amy's hand on the defendant's leg, next to his penis.  Upon seeing this, Amy's mother frantically knocked on the window and told Amy to come inside.

Amy went inside, and her mother took her upstairs to talk to her.  Once they were upstairs, Amy began to tell her mother about various incidents when the defendant touched her inappropriately.  Amy's mother made written notes of Amy's account of the incidents.[6]  These incidents occurred over a

_____

[6] Amy's mother testified as a first complaint witness.

period of three years, always outside the defendant's camper.[7]

Amy would walk with the defendant back to his camper after dinner.  According to Amy's testimony, the defendant touched her breasts, her vagina, and kissed her multiple times on the mouth, breasts, and vagina.  Amy testified that these events made her feel uncomfortable.  She testified to one particular incident where the defendant put his hand on the back of her head and forced her head down toward his penis because he wanted her to perform oral sex.  She refused and told him she did not want to do that.  The defendant told her to keep it a secret because, if she did not, he could get in trouble.  Amy testified that the defendant's penis was exposed but that she could not see it because it was dark out and she could not describe it.

After the September 11 incident, Amy was not allowed to go outside the house while the defendant was still on the property, and the defendant was not allowed in the home.  The defendant stayed for about another week on the property.  A few days after Amy made these disclosures, her mother reported the incidents to the police, who then began an investigation.

2.  <u>Indecent assault and battery on person with intellectual disability</u>.  a.  <u>Constitutionality of G. L. c. 265,</u>

---

[7] Although Amy testified that these various incidents of inappropriate touching occurred over three years, the record does not state specific dates.  Three years before the September 11, 2011, porch incident would be 2008, before the effective date of the statutory amendments.

§ 13F.  The defendant argues that the term "intellectual disability" renders § 13F unconstitutionally vague on its face under the State and Federal Constitutions because the term is a "neologism" that does not have a usual and accepted meaning.  We disagree.  The defendant did not raise the issue in a pretrial motion to dismiss, the required procedure for a facial challenge based on vagueness.[8]  See Commonwealth v. Moses, 436 Mass. 598, 605 n.4 (2002); Commonwealth v. Chou, 433 Mass. 229, 237 (2001).  We review under the standard of a substantial risk of a miscarriage of justice.

The void-for-vagueness doctrine is well established in our jurisprudence.  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."  Grayned v. Rockford, 408 U.S. 104, 108 (1972).  A criminal statute must define the offense "in terms that are sufficiently clear to permit a person of average intelligence to comprehend what conduct is prohibited."  Commonwealth v. Spano, 414 Mass. 178, 180 (1993).  See Kolender v. Lawson, 461 U.S. 352, 357 (1983); Commonwealth v. Bohmer, 374

---

[8] An as-applied challenge based on vagueness frequently depends on the evidence at trial, and may be raised in a motion for a required finding of not guilty.  See Commonwealth v. Kwiatkowski, 418 Mass. 543, 545 (1994).  If a defendant fails to raise an as-applied challenge in a motion for a required finding of not guilty, the issue will be considered under the standard of a substantial risk of a miscarriage of justice.  See Commonwealth v. Chou, 433 Mass. 229, 238 (2001).

Mass. 368, 371-372 (1978). "When a statute does not define its words we give them their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose. . . . We derive the words' usual and accepted meanings from sources presumably known to the statute's enactors, such as their use in other legal contexts and dictionary definitions" (citations omitted). Commonwealth v. Bell, 442 Mass. 118, 124 (2004). A criminal statute must not be so vague that it opens itself up to arbitrary enforcement and prosecution. See Grayned, supra at 108-109; Commonwealth v. Freiberg, 405 Mass. 282, 289, cert. denied, 493 U.S. 940 (1989). "[A] vague statute offends by its lack of reasonably clear guidelines for law enforcement and its consequent encouragement of arbitrary and erratic arrests and prosecutions." Commonwealth v. Sefranka, 382 Mass. 108, 110 (1980).

However, "[i]t is not infrequent that prescribed conduct is incapable of precise legal definition." Jaquith v. Commonwealth, 331 Mass. 439, 442 (1954). "[L]egislative language need not be afforded 'mathematical precision' in order to pass constitutional muster." Commonwealth v. Reyes, 464 Mass. 245, 249 (2013), quoting Bohmer, 374 Mass. at 372. A statute will be deemed constitutional if it "conveys [a] sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." Commonwealth

v. Adams, 389 Mass. 265, 270 (1983), quoting Commonwealth v. Jarrett, 359 Mass. 491, 496-497 (1971).  See Reyes, supra.

In this case, we conclude that the term "intellectual disability" is sufficiently clear and definite and is therefore not unconstitutionally vague.  The legislative history of § 13F, as amended through St. 2010, c. 239, §§ 71-72, makes it clear that the Legislature's intent was merely to change the nomenclature and not the substance of the statute.

Section § 13F was amended in 2010 in conjunction with numerous other laws by an act entitled, "An Act eliminating the word 'retardation' from the General Laws."  St. 2010, c. 239. The only revision made to § 13F was a substitution of the term "person with an intellectual disability" for the term "mentally retarded person" and the words "have an intellectual disability" for "be mentally retarded."  No substantive changes to § 13F were made by these amendments.  This change in language was part of a larger legislative scheme to eradicate the pejorative term "mentally retarded" from the General Laws.[9]  St. 2010, c. 239.[10]

---

[9] In addition to purging the General Laws of the term "mentally retarded," many other similar modifications took place in the quest for more respectful language.  Prior to 2009, the Department of Developmental Services, the agency charged with providing services to individuals with intellectual disabilities, was known as the Department of Mental Retardation. See G. L. c. 19B, § 1, as amended through St. 2008, c. 182, § 9. Correspondingly, the department amended its regulations by substituting "intellectual disability" for the term "mental retardation," but notably did not alter the substantive

Indeed, Massachusetts was part of a nationwide trend by which the United States Congress and many other State Legislatures enacted similar legislation in order to promote respect and dignity to those with intellectual disabilities.[11]  The

definition.  Compare 115 Code Mass. Regs. § 2.01 (2009) (defining "mental retardation" as "significantly sub-average intellectual functioning existing concurrently and related to significant limitations in adaptive functioning.  Mental retardation manifests before age [eighteen]"), with 115 Code Mass. Regs. § 2.01 (2012) (defining "intellectual disability" as "significantly sub-average intellectual functioning existing concurrently with and related to significant limitations in adaptive functioning.  Intellectual Disability originates before age [eighteen]").

Additionally, Governor Deval Patrick issued an executive order to rename the Governor's Commission on Mental Retardation as the Governor's Commission on Intellectual Disability.  Executive Order No. 521 (Mar. 31, 2010).  In support of renaming the commission, the executive order referenced the widespread movement in using "intellectual disability," stating, "[Whereas], there is a strong trend, nationally and internationally, to use the term 'intellectual disability' rather than mental retardation . . . ."  Id.

[10] The Legislature did not succeed completely in eliminating the term "mentally retarded" from the General Laws.  The last sentence of the second paragraph of G. L. c. 265, § 13F, was not amended, and states:  "This section shall not apply to the commission of an assault and battery by a mentally retarded person upon another mentally retarded person."  We perceive this to be a mere oversight that does not affect our analysis.

[11] In 2010, President Barack Obama signed legislation entitled "Rosa's Law" that amended various Federal education, labor, and health laws by removing the words "mental retardation" and replacing them with the words "intellectual disabilities."  Pub. L. 111-256, 111th Cong., 124 Stat. 2643 (2010).  In 2012, California enacted a law that eliminated the words "mentally retarded" in State laws, regulations, and publications and replaced them with the words "intellectual disability."  2012 Cal. St. c. 457.  In 2013, the Social

Legislature did not intend to change the substance of the statute with the substitution of the words "intellectual disability" but only intended the statute to contain more respectful and acceptable terms.

The term "intellectual disability" is not defined by § 13F. In such cases we apply the familiar rule of statutory construction that guides us to give the words "their usual and accepted meanings, as long as these meanings are consistent with the statutory purpose." Bell, 442 Mass. at 124, quoting Commonwealth v. Zone Book, Inc., 372 Mass. 366, 369 (1977). As has been discussed, "intellectual disability" has become the accepted term for someone who would have been described as mentally retarded prior to the various statutory and regulatory amendments. The definition of "mentally retarded" in 115 Code

---

Security Administration promulgated a final rule that eliminated the term "mental retardation" and replaced it with "intellectual disability." 78 Fed. Reg. 46,499 (2013). The agency explained, "This change reflects the widespread adoption of the term 'intellectual disability' by Congress, government agencies, and various public and private organizations." Id. The United States Supreme Court has discontinued use of the term "mental retardation" and now uses the term "intellectual disability." Hall v. Florida, 134 S. Ct. 1986, 1990 (2014). Justice Kennedy, in an opinion analyzing a Florida statute regarding the death penalty and intellectually disabled defendants, stated by way of introduction: "Previous opinions of this Court have employed the term 'mental retardation.' This opinion uses the term 'intellectual disability' to describe the identical phenomenon." Id. He went on to explain that the term "intellectual disability" is also used in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders. Id.

Mass. Regs. § 2.01 prior to the 2010 statutory amendments was identical to the definition given to the term "intellectual disability" in the regulations after the statutory amendments. See note 9, supra.

Prior to the 2010 amendments, Massachusetts courts had referenced the definition of "mental retardation" found in the regulations of the Department of Developmental Services (department) to define "mental retardation" under § 13F and other statutes. See e.g., Commowealth v. Fuller, 66 Mass. App. Ct. 84, 96 (2006); Commonwealth v. Aitahmedlamara, 63 Mass. App. Ct. 76, 76-77 (2005) (discussing "usual and accepted meaning" of "mental retardation" under § 13F). "Administrative regulations have been frequently used as guides to determine the meaning of statutory provisions." 1A N.J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 31.6, at 696 (7th ed. 2009). In Fuller, supra, the Appeals Court held that an instruction given to a jury regarding the definition of "mental retardation" "was consistent with the usual and accepted understanding of the meaning of the words 'mentally retarded' as well as the definition promulgated by the [Department of Mental Retardation] at 115 Code Mass. Regs. § 2.01 (1994)."[12] Fuller,

_____

[12] In Executive Order No. 521, changing the name of the Governor's Commission on Mental Retardation, Governor Deval Patrick stated, "[Whereas], the Department of Developmental Services changed its regulations to make the term 'intellectual

supra.  The trial judge in Fuller had instructed the jury that "[a] mentally retarded person is a person who, as a result of inadequately developed or impaired intelligence, is substantially limited in his or her ability to learn or to adapt to the means necessary to function effectively in the community."  Id. at 94.  As noted above in note 9, the regulations since have been amended and now include the more accepted term "intellectual disability."  Those regulations define "intellectual disability" in identical terms as the term "mental retardation" previously had been defined.  Where "mental retardation"[13] is itself a commonly understood term, see id. at 96, and where it is synonymous with "intellectual disability," the latter also is a commonly understood term.

In addition to the regulatory definition, the Diagnostic and Statistical Manual of Mental Disorders defines "intellectual disability" as "a disorder with onset during the developmental period that includes both intellectual and adaptive functioning

---

disability' synonymous  with mental retardation . . . ." Executive Order No. 521 (Mar. 31, 2010).

[13] The 2012 regulations also noted that the substituted definition is consistent with the standard used in the eleventh edition of American Association of Intellectual Disabilities: Definition, Classification, and Systems of Supports (2010).  115 Code Mass. Regs. § 2.01 (2012).

deficits in conceptual, social, and practical domains."[14] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 33 (5th ed. 2013). These definitions maintain the core concept that an intellectual disability consists of intellectual limitations and affects adaptive behaviors. In this case, no one questioned whether Amy in fact had an intellectual disability. The defendant himself acknowledged on direct examination that he knew Amy had "intellectual disabilities" and the record demonstrates that it was generally understood that Amy had an intellectual disability. We conclude that the term "intellectual disability" has an accepted and well understood meaning, and applying that meaning to the defendant does not render the statute unconstitutionally vague.

The defendant also argues the judge's instructions defined the term "intellectual disability" in a manner that was erroneous.[15] The judge's instruction incorporated the definition

---

[14] The American Association on Intellectual and Developmental Disabilities defines "intellectual disability" as "a disability characterized by significant limitations both in intellectual functioning . . . and in adaptive behavior." See American Association on Intellectual and Development Disabilities, Frequently Asked Questions on Intellectual Disability, http://aaidd.org/intellectual-disability/definition/faqs-on-intellectual-disability#.VfxrPVKFNaR [http://perma.cc/G6CS-5V5G].

[15] The defendant does not allege error for the remaining portions of the jury instructions. The trial judge instructed

of "person with disability" from G. L. c. 265, § 13K, which proscribes assault and battery on an elderly or disabled person. The defendant contends that this definition did not cure the problem of vagueness in § 13F, and it permitted the jury to convict him under § 13K. The defendant did not object to the trial judge's instructions. We review the instruction under the standard of a substantial risk of a miscarriage of justice. See Commonwealth v. Ford, 424 Mass. 709, 712 (1997); Commonwealth v. Mitchell, 67 Mass. App. Ct. 556, 565 (2006). We look to the jury instructions as a whole in order to determine if there was a substantial risk of a miscarriage of justice. See Commonwealth v. Shea, 467 Mass. 788, 796 (2014); Commonwealth v. Whitman, 430 Mass. 746, 755 (2000). We agree that the trial judge's jury instructions regarding the definition of "intellectual disability" were erroneous. However, the error did not create a substantial risk of a miscarriage of justice.

General Laws c. 265, § 13K, defines "person with disability" as "a person with a permanent or long-term physical or mental impairment that prevents or restricts the individual's ability to provide for his or her own care or protection." The definition of "person with disability" in § 13K encompasses a

---

the jury that "intellectual disability is a permanent or long-term mental impairment that prevents or restricts the individual's ability to provide for her own care or protection."

greater variety of disabilities than does § 13F, including Alzheimer's disease and a number of other disabilities. However, it also includes "intellectual disability" under § 13F.

The erroneous jury instruction did not create a substantial risk of a miscarriage of justice because the disability that was the focus of the evidence at trial was an intellectual disability. Amy's condition met the definition from § 13K that the judge used to instruct the jury, and it is highly unlikely that the jury would have based its verdict on any other disability, such as Alzheimer's disease. We conclude that the defendant has failed to show the existence of a substantial risk of a miscarriage of justice. In future trials under § 13F, it would be appropriate to instruct a jury with the definition of "intellectual disability" as used in the regulations of the department. That definition is consistent with other organizations' definition of "intellectual disability" and is well understood.

b. <u>Motion for required findings of not guilty</u>. i. <u>Consent</u>. The defendant argues that his trial and posttrial motions for required findings of not guilty should have been granted as to the indictment under G. L. c. 265, § 13F, concerning the incident on September 11, 2011, because the Commonwealth presented insufficient evidence of lack of consent. The Commonwealth argues that the judge correctly denied the

defendant's motions because there was sufficient evidence that the defendant intended for Amy to touch his penis and that the combination of her intellectual disability and the significant age difference between them is sufficient to prove Amy did not consent to the touching on that date.  When deciding a motion for a required finding of not guilty, we view the evidence in the light most favorable to the Commonwealth.  Commonwealth v. Latimore, 378 Mass. 671, 676-677 (1979).  We must determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Commonwealth v. Cohen (No. 1), 456 Mass. 94, 120 (2010), quoting Latimore, supra at 677.

The elements of an indecent assault and battery on a person with an intellectual disability include lack of consent, and the Commonwealth bears the burden of production and persuasion on the issue.  See Commonwealth v. Portonova, 69 Mass. App. Ct. 905, 906 (2007).  The element of lack of consent in a prosecution for indecent assault and battery is the same as in a prosecution for rape.[16]  See Commonwealth v. LeBlanc, 456 Mass.

_____

[16] Capacity to consent may be an issue in such cases.  "In order to give consent a person must . . . have the capacity to do so."  Commonwealth v. Burke, 390 Mass. 480, 484 (1983).  Capacity to consent can be affected by a number of different factors, including intoxication, consumption of drugs, sleep, unconsciousness, head injury, and intellectual disability.  See Commonwealth v. Blache, 450 Mass. 583, 590 n.10 (2008).  The judge did not instruct the jury on lack of capacity to consent,

135, 138 (2010); Commonwealth v. Simcock, 31 Mass. App. Ct. 184, 188 (1991). In this case, the Commonwealth presented sufficient evidence from which the jury could find that, in the totality of the circumstances, including Amy's intellectual disability, Amy did not consent.

The evidence of Amy's intellectual disability was prevalent. Amy's mother testified that she was diagnosed with "slow learning, special needs" when she was eight months old. She also revealed that Amy was missing the left half of her cerebellum. Amy read at a third or fourth grade level and her mother described her age range relative to over-all mental capacity as spanning from that of a young age to that of a teenager in regards to her moods. State police Trooper Dale Gero, the officer who investigated the incidents, testified that Amy appeared to act like a five to seven year old child.[17] The mother's boy friend described Amy as "basically" a child and as "a woman with a child's mind." Amy had an IQ of forty-seven and lacked the mental capabilities to complete a high school

---

thereby effectively removing the possibility of a verdict on that evidence alone. He only instructed on lack of consent, but told the jury that they could consider Amy's state of mind on this element of the Commonwealth's proof.

[17] State police Trooper Dale Gero based his opinion on his observation of Amy and his experience of having a five year old daughter of his own.

program.[18]  Her mother testified that Amy's mental disability is classified as mental retardation.  Amy was not allowed to go shopping by herself.  Additionally, the jury were able to observe Amy testify and assess the scope of her intellectual disability.  See Fuller, 66 Mass. App. Ct. at 90; Aitahmedlamara, 63 Mass. App. Ct. at 77-78 ("the victim testified extensively at trial, and the jury were able from their observations of her to assess both the question of her mental retardation and the likelihood that the defendant was aware of it").  While testifying, Amy required a number of breaks.

There was evidence from which the jury could have found that Amy perceived that the defendant had authority over her because of his friendship with her family, "the considerable age disparity between [them,] . . . and an obvious disparity in experience and sophistication."  Commonwealth v. Shore, 65 Mass. App. Ct. 430, 432 (2006), quoting Commonwealth v. Castillo, 55 Mass. App. Ct. 563, 567 (2002).  There was evidence of prior unwanted sexual touching.  With respect to the incidents before September 11, 2011, Amy testified that she felt uncomfortable, and that the defendant told her to keep these incidents secret because he could get in trouble.  The jury reasonably could have

_____

[18] Amy obtained a certificate of attendance in 2010 when she was twenty-two years old.

found that, in the totality of the circumstances, including Amy's intellectual disability, she did not consent to the sexual touching.

The fact that the defendant did not do the touching on this occasion did not preclude the jury from convicting him of indecent assault and battery on a person with an intellectual disability. See Portonova, 69 Mass. App. Ct. at 905-906 (reiterating our case law does not require defendant to do touching); Commonwealth v. Davidson, 68 Mass. App. Ct. 72, 73, 75-76 (2007) (defendant convicted of indecent assault and battery on child under age of fourteen, G. L. c. 265, § 13B, when victim touched his penis and rubbed his "private" with her nose). "The gravity of the conduct rises to the level which the[] statute[] [was] designed to prohibit." Davidson, supra at 75-76, quoting Commonwealth v. Nuby, 32 Mass. App. Ct. 360, 362 (1992).

ii. Ex post facto law. The defendant further argues that his motions for required findings of not guilty as to the four remaining indictments charging him with violations of § 13F should have been allowed because the Commonwealth presented insufficient evidence that these acts occurred after the 2010 amendments to § 13F. He further contends that as a result, his convictions violate the prohibitions against ex post facto laws under art. I, § 10, of the United States Constitution and art.

24 of the Massachusetts Declaration of Rights. Specifically, he asserts that as a matter of law he could not have been convicted under § 13F, based on conduct that occurred prior to November 2, 2010, when the statutory amendments took effect. As discussed above, the substitution of the term "intellectual disability" for "mental retardation" did not change the substance of the statute. The two terms are synonymous. Therefore, the defendant's conduct was illegal prior to the 2010 amendments as well as after. The statutory amendments had no retrospective effect that operated to the detriment of the defendant. See Commonwealth v. Fuller, 421 Mass. 400, 408 (1995). The evidence was sufficient, and the convictions do not violate the ex post facto prohibitions of the Federal or Massachusetts Constitutions.

c. Ineffective assistance of counsel. The defendant argues that the judge erred in the denial of his motion for a new trial, which claimed that the defendant received ineffective assistance of counsel. Specifically, the defendant asserts that counsel failed to move to dismiss the complaint on the grounds that G. L. c. 265, § 13F, was void for vagueness, failed to argue effectively that the Commonwealth's evidence was insufficient, and failed to request jury instructions that the defendant could not be convicted based on acts occurring prior to November 2, 2010, the effective date of the statutory

amendments.  We conclude that the defendant's counsel was not ineffective because such motions and arguments would not have succeeded.

When analyzing an ineffective assistance of counsel claim, a defendant must first show that "there has been serious incompetency, inefficiency, or inattention of counsel" and behavior that falls "measurably below that which might be expected from an ordinary fallible lawyer."  Commonwealth v. Saferian, 366 Mass. 89, 96 (1974).  If the first prong is satisfied, then a defendant must show "whether it has likely deprived the defendant of an otherwise available, substantial ground of defence."  Id.

For the reasons stated above, the defendant's trial counsel would not have been successful on a motion to dismiss on the ground that G. L. c. 265, § 13F, is void for vagueness. Commonwealth v. Conceicao, 388 Mass. 255, 264 (1983) ("It is not ineffective assistance of counsel when trial counsel declines to file a motion with a minimal chance of success").  For the reasons stated above, the defendant's other arguments also would not have been successful.

3.  Motion for required finding of not guilty -- indecent exposure.  The defendant asserts error in the denial of his motion for a required finding on not guilty as to the indictment alleging indecent exposure.  Specifically, he argues that the

Commonwealth presented insufficient evidence that he intentionally exposed his genitals to Amy and that Amy was offended by the exposure.[19] The Commonwealth argues that it presented sufficient evidence on the charge of indecent exposure because a reasonable person in Amy's position would have been offended by the defendant's act of forcing Amy's head down toward his penis for the purpose of placing her mouth on his penis. We agree with the Commonwealth.

Indecent exposure requires proof of an "intentional act of lewd exposure, offensive to one or more persons." Commonwealth v. Swan, 73 Mass. App. Ct. 258, 261 (2008), quoting Commonwealth v. Broadland, 315 Mass. 20, 21-22 (1943). The exposure of one's genitalia is a necessary element to indecent exposure. Commonwealth v. Arthur, 420 Mass. 535, 540-541 (1995). Offensive behavior are acts "that cause 'displeasure, anger or resentment'" and are "repugnant to the prevailing sense of what is decent or moral." Commonwealth v. Sullivan, 469 Mass. 621, 625 (2014), quoting Commonwealth v. Cahill, 446 Mass. 778, 781 (2006).

---

[19] The defendant argues that the Commonwealth presented two independent factual bases for indecent exposure. However, this is unclear because the Commonwealth only discusses the incident where the defendant forced Amy's head down to his penis. The Commonwealth's argument that sufficient evidence was presented to convict on the charge of indecent exposure discussed only that one incident.

Amy testified that one night near the defendant's camper, the defendant put his hand behind her head and forced it down toward his "private part." When asked whether "boys pee from their private part," Amy answered, "Yes." Amy first testified that it was so dark out that she could not even see his "private part." However, when asked whether his "private part" was inside or outside of his pants, she responded that it was outside of his pants. She could not remember what his "private part" looked like. Amy testified that the defendant wanted her to put her mouth on his "private part" but she told him no and that she wanted to go inside.

The defendant argues that there is insufficient evidence that he intentionally exposed his genitals to Amy. He argues that Amy unambiguously testified that it was too dark out to see the defendant's penis. Although Amy did testify that it was so dark out that she could not even see his "private parts," she also testified that his "private part" was outside of his pants. Conflicting inferences that can be drawn from the evidence are for the jury to resolve. Commonwealth v. Miranda, 458 Mass. 100, 113 (2010), cert. denied, 132 S. Ct. 548 (2011). "When assessing the sufficiency of the evidence, we resolve issues of credibility in favor of the Commonwealth . . . ." Commonwealth v. James, 424 Mass. 770, 785 (1997). The jury reasonably could infer (as did Amy when she testified that the defendant wanted

her to effect oral sex on him) that the defendant exposed his penis and pushed her head down toward his penis because it was his intention that Amy effect fellatio.  We conclude that the Commonwealth presented sufficient evidence for a reasonable trier of fact to find that the defendant exposed his penis to Amy.

The defendant further argues that Amy never testified that she was offended any of the times that she saw the defendant's penis.[20]  Although Amy never specifically testified that she was offended by the defendant's actions, she did describe the defendant's act of grabbing the back of her head and forcing her head down toward his penis.  She testified that she told him that she did not want to do that and that she wanted to go inside.  A jury rationally could infer that by saying no and by expressing her desire to detach herself from the situation, she felt "displeasure" toward defendant's conduct.  See Sullivan, 469 Mass. at 625, quoting Cahill, 446 Mass. at 781.  We are satisfied that the Commonwealth presented sufficient evidence from which a reasonable trier of fact could determine that Amy was offended by the defendant's conduct.

---

[20] The defendant is unclear in his brief as to what incidents he is referring; however, he argues that the Commonwealth must prove beyond a reasonable doubt that the defendant exposed his genitals and on the same occasion offended the victim.  We will limit our discussion to whether Amy was offended during the incident where the defendant forced her head down.

4.  Motion for required finding of not guilty -- accosting or annoying a person of the opposite sex.  The defendant contends that the judge erred by not granting his motion for a required finding as to the indictment alleging accosting or annoying a person of the opposite sex.  Specifically, he argues that the Commonwealth presented insufficient evidence to establish that the defendant's conduct was disorderly.  The Commonwealth responds that the defendant's act of forcing Amy's head toward his penis for the purpose of oral sex was offensive and disorderly conduct.

General Laws c. 272, § 53, states that "persons who with offensive and disorderly acts or language accost or annoy another person . . . shall be punished."  The statute requires proof beyond a reasonable doubt that the act was both offensive and disorderly.  Commonwealth v. Lombard, 321 Mass. 294, 296 (1947).  The requirements of being offensive and being disorderly are distinct from one another.  Id.  The Commonwealth also must prove that the acts were offensive and disorderly to a reasonable person, applying an objective standard.  Sullivan, 469 Mass. at 625; Cahill, 446 Mass. at 781, citing Chou, 433 Mass. at 235.

Offensive acts, as discussed above "cause a complainant to feel displeasure, anger, resentment, or the like, and such acts or language would be considered indecent or immoral by a

reasonable person." Sullivan, 469 Mass. at 625. Offensive acts also require "proof of sexual conduct or language, either explicit or implicit." Id. at 626. We have determined that explicit sexual conduct is self-explanatory and implicit sexual conduct or language means conduct or language, "which a reasonable person would construe as having sexual connotations." Id.

Disorderly conduct is distinct from offensive conduct. Lombard, 321 Mass. at 296. Disorderly acts "are those that involve fighting or threatening, violent or tumultuous behavior, or that create a hazardous or physically offensive condition for no legitimate purpose of the actor, whether the resulting harm is suffered in public by the public or in private by an individual." Chou, 433 Mass. at 233. To be physically offensive, a defendant must act in such a way that a reasonable person would fear "imminent physical harm." Sullivan, 469 Mass. at 627. Context is taken into account when analyzing whether acts are physically offensive or threatening. Id. at 628, quoting Commonwealth v. Ramirez, 69 Mass. App. Ct. 9, 16 (2007) ("context is critical"). The jury could have found that the defendant's act of forcing Amy's head down toward his penis caused her to fear imminent physical harm.

The incident in question here is, again, the defendant's act of forcing Amy's head down toward his penis. The defendant

argues that the evidence the Commonwealth presented demonstrates that the defendant's actions were brief and minimal and fall outside the spectrum of that which is offensive. We disagree. As discussed above, the defendant's act of forcing Amy's head down for the purpose of engaging in oral sex was offensive. As the defendant was forcing her head down, Amy told him no and that she wanted to go back inside. A reasonable person would infer from Amy's inclination to go back inside that at the very least she felt "displeasure," and in fact was offended by the conduct. Sullivan, 469 Mass. at 625. The act of forcing Amy's head down toward his penis also can be construed as a physically offensive condition. Viewing the events in context, Amy reasonably could have feared imminent physical harm. The incident occurred outside, and at night, near the defendant's camper. Amy is intellectually disabled and significantly younger than the defendant. This was not just one isolated incident of the defendant making sexual advances toward Amy. Amy testified to various times where he touched her breasts and her vagina. Viewing the defendant's actions within this context could place a reasonable person in fear of imminent physical harm. Additionally, forcing a person's head down toward one's penis to engage in sexual conduct could place a reasonable person in fear of imminent physical harm. We conclude that the Commonwealth provided sufficient evidence that the defendant's

behavior was disorderly, and that the motion for a required finding of not guilty properly was denied.

5. <u>Conclusion</u>.  For the foregoing reasons, we determine G. L. c. 265, § 13F, as amended through St. 2010, c. 239, §§ 71-72, to be constitutional, and we affirm the defendant's convictions of indecent assault and battery on a person with an intellectual disability, indecent exposure, and accosting or annoying a person of the opposite sex.  We also affirm the orders denying the defendant's motions for a new trial and for required findings of not guilty.

<u>So ordered</u>.