NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-909

COMMONWEALTH

vs.

DEREK MANCEVICE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The defendant, Derek Mancevice, appeals from his conviction of possession of ammunition without a license, pursuant to G. L. c. 269, § 10 (h) (1).  His principal argument is that he was convicted in violation of the Second Amendment to the United States Constitution, because he had a lawfully issued license to carry firearms and ammunition that he claims was wrongfully suspended by the licensing officer, the chief of police of Barre, six days before the defendant was found to be still in possession of ammunition.  Relying on New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen), the defendant argues that the suspension violated the Second Amendment because the "suitability" requirement of G. L. c. 140, §§ 131 (d) and

(f), and related provisions (as in effect in 2018), granted too much discretion to the licensing authorities to suspend firearm licenses, and thus were unconstitutional either on their face or as applied.[1]

For the reasons that follow, we affirm the defendant's conviction. As to the defendant's facial challenge, to be unconstitutional on their face, G. L. c. 140, §§ 131 (d) and (f), would have had to violate the Second Amendment in all of their applications. See United States v. Rahimi, 602 U.S. 680, 693 (2024). The statutes did not fail under this test, because they provided for suspension of licenses for many valid reasons, such as when a person has been convicted of a felony or determined to be a threat to another person pursuant to G. L. c. 209A. See G. L. c. 140, §§ 131 (d), (f), as amended through St. 2018, c. 123, §§ 11-12. Licenses to carry may certainly be suspended for those reasons, or any time the license holder has been "found by a court to pose a credible threat to the physical

---

[1] As discussed in more detail infra, the defendant's arguments focus in particular on the "may issue" language of §§ 131 (d) and (f), as those sections existed in 2018 and were applicable to his case. The "may issue" language has since been removed from the statute by amendment, although the "suitability" requirement remains. See St. 2022, c. 175, §§ 7, 9, 10, 12. This memorandum and order addresses the statutes as they existed at the time of the defendant's license suspension and criminal acts in 2018.

safety of another," as the United States Supreme Court recently held in Rahimi, supra at 702.

Nor has the defendant mounted a meritorious as-applied challenge, because as framed his as-applied challenge is not materially different from his facial challenge. Put differently, the defendant has not raised a specific challenge to the reason for the suspension. And in any event, here the defendant's license to carry was suspended under G. L. c. 140, § 131 because he was charged with the crime of witness intimidation, G. L. c. 268, § 13B, and also, apparently, because a few weeks after he was charged with witness intimidation, he was involved in an altercation at a local market, at which he brandished a firearm. Suspending a license to carry under those circumstances fits comfortably within the Supreme Court's approval of "firearm laws [that] . . . prevent[] individuals who threaten physical harm to others from misusing firearms," Rahimi, 602 U.S. at 690. Accordingly, the defendant has shown no constitutional infirmity in his conviction. As we discern no merit in the other arguments the defendant raises, we affirm.

Background. In 2018, the defendant Mancevice had a license to carry firearms issued by the police chief of Barre. On July 3, 2018, Mancevice was charged with intimidation of a witness under G. L. c. 268, § 13B. A separate incident occurred a few weeks later, on August 25, 2018, when witnesses claimed

3

Mancevice was involved in an altercation in which he brandished a firearm.

The Barre chief of police suspended Mancevice's license to carry two days after the second incident, on August 27, 2018. The chief of police did so through a notification sent by certified mail, which Mancevice received on September 6. The notification stated that the reason for the suspension was that Mancevice was "deemed to be an unsuitable person" because "[l]icensee has been charged with a felony under [G. L. c. 268, § 13B]." Mancevice was informed that he was required to turn over to the Barre police department "without delay, your firearms license(s) and all firearms, rifles, shotguns, machine guns, large capacity feeding devices, and ammunition which you have in your possession or which are owned by you" (emphasis added). The notification further informed Mancevice that his failure to do so would be a crime.

On September 10, four days after receiving the notice, Mancevice went to the Barre police station and turned over various firearms. He did not at that time turn over his license to carry, nor any ammunition. On September 11, Mancevice returned to the police station, where a Barre police officer, William Recos, informed Mancevice that he still needed to turn over his license to carry. Mancevice then tendered his license to carry, stating he was doing so "under protest." After

4

Mancevice left, Recos printed a list of all firearms registered to Mancevice and determined that there were six firearms still outstanding. Recos thereafter received a report that Mancevice was attempting to transfer certain firearms and ammunition to others. Based on this information, Recos obtained a search warrant for Mancevice's residence.

The Barre police executed the search warrant on September 12. The police found alleged ammunition strewn throughout Mancevice's apartment, as well as pieces of firearms including barrels, stocks, and receivers. During the search, Mancevice arrived and was advised of his Miranda rights. Mancevice was asked why he had not turned over his ammunition, and he responded that he was not able to turn over "every little piece that he owned." Mancevice was also asked what "without delay" meant to him, and he stated "as soon as humanly possible."

Mancevice was charged with multiple counts of (1) failure to surrender firearms and failure to surrender a license to carry or possess firearms, G. L. c. 269, § 10 (i), as amended through St. 2014, c. 284, § 90, and (2) possession of ammunition without a firearm identification (FID) card, G. L. c. 269, § 10 (h) (1), as amended through St. 2014, c. 284, § 90.[2]

---

[2] These included twenty-one counts of failure to surrender a license to carry firearms or failure to surrender firearms, twenty of which were later dismissed, and two counts of

5

Mancevice filed two separate motions to dismiss the charges, each of which raised arguments based on the Second Amendment, and each of which was denied.  In April of 2019 -- prior to the Supreme Court's decision in Bruen -- Mancevice raised two principal arguments:  first, that G. L. c. 269, § 10 (i), which criminalizes the knowing failure to surrender a suspended license, is unconstitutional on its face, because it "violates the Second Amendment's right to possess arms in the home for self-defense."  The focus of this argument was that the police had not provided Mancevice with adequate time to comply with the suspension order, because they had executed a search warrant, in his home, within days of the suspension decision.[3]  Second, Mancevice argued that § 10 (i) was unconstitutional as applied to him, because the statute's requirement of surrender "without delay" was too vague under the circumstances, and given the Second Amendment rights at stake.

Subsequently, in 2022, after Bruen was decided, the defendant filed a "renewed" motion to dismiss under the Second

---

possession of ammunition without an FID card, one of which was later dismissed.

[3] Mancevice also argued that under G. L. c. 140, § 129D, as amended through St. 2014, c. 284, §§ 42-44, and G. L. c. 140, § 131 (f), as amended through St. 2018, c. 123, §§ 11-12, he was entitled to a ninety-day period to surrender his firearms, and therefore he could not have violated the surrender requirement as a matter of law.

Amendment.  That motion focused on Bruen's holding that a firearm regulation must be "consistent with the Nation's historical tradition" of such regulation, Bruen, 597 U.S. at 24, and argued that the prohibition on the unlicensed possession of ammunition was not supported by historical analogs.  That argument was rejected by the motion judge, and is not pressed on appeal.  While the renewed motion also made a passing reference challenging the "process" by which the license was suspended, the renewed motion did not directly raise the argument the defendant now presses -- the defendant did not argue below that the "suitability" provisions of G. L. c. 140, §§ 131 (d) and (f), granted unconstitutional discretion to the licensing authority to suspend or to deny firearm licenses.

The case was tried to a jury on February 17, 2023.  Prior to trial, Mancevice filed a motion in limine "to exclude purported opinion testimony, whether lay or expert, . . . that the items seized . . . meet the definition of 'ammunition.'"  The Commonwealth did not object and this motion was allowed.  At trial, Officer Recos, who conducted the search of the defendant's home, testified several times that he had found "ammunition" in the home.  The last of these references drew an

7

objection from defense counsel, although the resolution of that objection is unclear on the record.[4]

After the Commonwealth rested, Mancevice filed a motion for a required finding of not guilty on several grounds, including that the Commonwealth had failed to adduce evidence that the alleged ammunition was in fact ammunition. This motion was denied. At the conclusion of trial, the jury returned a verdict of guilty on the charge of possession of ammunition without an FID card, and not guilty on the charge of failure to surrender a license to carry. Mancevice appeals.

Discussion. The defendant raises four arguments on appeal: (1) that the defendant's license was "suspended under a discretionary 'unsuitability' statute that Bruen held unconstitutional," (2) that under G. L. c. 140, § 129D, as amended through St. 2014, c. 284, §§ 42-44, the defendant should have been allowed ninety days to surrender his firearms and

---

[4] During his direct examination, Recos testified without objection that he found "numerous amounts of ammunition" at Mancevice's residence. The prosecutor asked if Recos recalled "where the ammunition you found was," and Recos testified that it was strewn throughout the apartment. The prosecutor then placed a bag in front of the witness and asked: "How are you familiar with the contents of that bag?" Recos answered, "This is all ammunition that was seized the --" at which point he was cut off by defense counsel's objection. The attorneys conferred with the judge at sidebar; however, the bulk of their discussion, including the judge's ruling on the issue, was not included in the record. The physical evidence in the bag was admitted.

8

ammunition, (3) that it was error to allow Officer Recos's testimony that he found "ammunition" during the search of the defendant's home, and (4) that there was insufficient evidence that the items seized met the legal definition of "ammunition." We address each argument in turn.

1. Second Amendment arguments. The defendant argues that §§ 131 (d) and (f) (as in effect in 2018) were unconstitutional under Bruen, because they vested discretion in the licensing authority to deny a license based upon "unsuitability," and thus impinged on his right to bear arms.[5] The defendant had previously applied for, and received, a "license to carry" firearms, as authorized by G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11-12. In 2018, § 131 (d) provided that the "licensing authority"[6] "may issue" a license to carry if

---

[5] The defendant does not claim on appeal that the statute under which he was convicted, G. L. c. 269, § 10 (h) (1) (possession of ammunition without an FID card), is unconstitutional. Mancevice instead challenges §§ 131 (d) and (f), arguing that because the suspension of his license was unconstitutional, he could not be convicted of possessing ammunition unlawfully. On appeal the Commonwealth argues that because Mancevice never challenged the suspension of his license through the statutory appeal procedure, he cannot challenge the constitutionality of his conviction. Put differently, the Commonwealth's view is that Mancevice could be guilty of unlicensed possession even if the suspension of the license was unconstitutional. As we decide today that Mancevice's constitutional challenges to the suspension of his license fail, we need not address the Commonwealth's argument.

[6] The licensing authority was "the chief of police or the board or officer having control of the police in a city or town,

9

certain conditions were met, including that "the applicant is not a prohibited person as set forth in this section."[7,8] Section 131 (d) went on to state, however, that the licensing authority "may" deny or suspend a license to carry,

> "if, in a reasonable exercise of discretion, the licensing authority determines that the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry. A determination of unsuitability shall be based on: (i) reliable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety; or (ii) existing factors that suggest that, if issued a license, the applicant or licensee may create a risk to public safety."

---

or persons authorized by them." G. L. c. 140, § 121, as amended through St. 2018, c. 123, §§ 1-7.

[7] A "prohibited person" was one who falls into a number of categories, including persons convicted of a felony or various other offenses, persons committed for mental illness or alcohol or substance abuse, persons under twenty-one, aliens who were not permanent residents, persons subject to protection orders under G. L. c. 209A, persons who were the subject of an outstanding arrest warrant, persons dishonorably discharged from the military, fugitives from justice, and persons who renounced their U.S. citizenship. G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11-12.

[8] The Supreme Court's decision in Bruen rendered invalid the language in § 131 (d) that required that the applicant show "good reason" for the license to issue. See Bruen, 597 U.S. at 15 n.2, 71. Section 131 (d) was subsequently amended by St. 2022, c. 175, §§ 4-17A, and St. 2024, c. 135, § 49, and now does not impose a "good reason" requirement. See G. L. c. 140, § 131 (d).

G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11-12.[9]

Section 131 (d) thus granted explicit authority to suspend the license to carry of an "unsuitable" person.[10]  And, § 131 (f) addressed the question as well:

> "A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed.  A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license" (emphasis added).

G. L. c. 140, § 131 (f), as amended through St. 2018, c. 123, §§ 11-12.

As indicated, the defendant argues that these two sections of the Massachusetts statutes violated the Second Amendment, both on their face and as applied to his circumstances.  The

---

[9] This section was also materially amended in 2022 by removing the "may issue" and "reasonable exercise of discretion" language, St. 2022, c. 175, §§ 7, 9, 10, such that § 131 (d) now states (in relevant part, after further amendments in 2024) that a licensing authority "shall issue" a license to carry "only if it appears that the applicant is neither a prohibited person nor determined to be unsuitable to be issued a license as set forth in . . . section 121F."

[10] Following the 2024 updates to the statutory scheme, the definition of unsuitability now states:  "A determination of unsuitability shall be based on reliable, articulable and credible information that the applicant has exhibited or engaged in behavior that suggests that . . . the applicant may create a risk to public safety or a risk of danger to themselves or others."  G. L. c. 140, § 121F (k).

11

thrust of his argument is that <u>Bruen</u> declared that all such "may issue" statutory schemes are unconstitutional, because they provide too much discretion to licensing authorities to deny persons the ability to carry a firearm.[11]  As indicated, the argument the defendant advances in this court is not the same Second Amendment argument that he pressed below -- at most, the argument he now presses was referenced so vaguely that it cannot fairly be said to have been raised.[12]  Although not raised below, we have in the past reviewed unpreserved claims that a charge should have been dismissed for vagueness for a substantial risk of a miscarriage of justice, see <u>Commonwealth</u> v. <u>St. Louis</u>, 473 Mass. 350, 355 (2015); <u>Commonwealth</u> v. <u>Mienkowski</u>, 91 Mass. App. Ct. 668, 674 (2017), and we assume without deciding that the same review applies to claims under the Second Amendment.  "A

---

[11] The Massachusetts firearm licensing scheme in effect in 2018 also authorized the granting of FID cards, which allowed a person to possess a firearm but granted fewer privileges than a license to carry.  G. L. c. 140, § 129B, as amended through St. 2018, c. 123, §§ 9, 10; G. L. c. 140, § 129C, as amended through St. 2014, c. 284, §§ 40, 41.  Mancevice did not have an FID card, as his license to carry provided all the privileges of an FID card.  See G. L. c. 140, § 131 (<u>a</u>), as amended through St. 2018, c. 123, §§ 11-12.

[12] In particular, the defendant never argued below, and did not argue to this court, that his actions did not meet the definition of "unsuitability" in § 131 (<u>d</u>).  Nor did he or does he argue constitutional infirmity in the statute's definition of unsuitability; in particular, the defendant does not specifically argue that the statute is or was unconstitutional because the actions the statute defines as unsuitable are overbroad.

12

substantial risk of a miscarriage of justice exists when we have a serious doubt whether the result of the trial might have been different had the error not been made" (quotation omitted). Commonwealth v. Curran, 488 Mass. 792, 794 (2021), quoting Commonwealth v. Valentin, 470 Mass. 186, 189 (2014). We conclude that there was no error and no substantial risk of a miscarriage of justice here.

The defendant posits that the Massachusetts licensing scheme (as of 2018) was "flatly unconstitutional under Bruen, because the Bruen Court already found no historical analog for . . . 'may issue' statutes" such as § 131 (d). This argument challenges the Massachusetts statute on its face. The defendant's reading of Bruen is incorrect.

Bruen struck down a New York license to carry statute under which a firearm license applicant had to show, among other things, that there was "proper cause" to obtain the license. Bruen, 597 U.S. at 12, 71. The New York courts had equated the term "proper cause" with a "special need for self-protection distinguishable from that of the general community" (citation omitted). Id. at 12. The Bruen Court held that such "proper cause" restrictions on firearm licensing are unconstitutional, because such regulations had no historical precedent from the periods when the Bill of Rights and the Fourteenth Amendment to the United States Constitution were adopted. See id. at 34-35,

13

38-39.  In so holding, however, the Court was focused on New York's "proper cause" requirement, and not on "may issue" language in general.  See id. at 71 ("New York's proper-cause requirement violates the Fourteenth Amendment" [emphasis added]).  The Bruen court made it clear that firearm licensing schemes generally are constitutional, as two of the six-person majority emphasized in a separate concurrence.  See id. at 79 (Kavanaugh, J., concurring) ("the Court's decision does not prohibit States from imposing licensing requirements for carrying a handgun for self-defense").  And footnote 1 of the majority opinion itself canvassed existing State laws, and indicated that the licensing schemes in at least three States (Connecticut, Delaware, and Rhode Island) that contained discretionary language, including a "suitability" requirement, nevertheless were constitutional -- because those States did not require applicants to show "proper cause," or some analogous showing, before obtaining a license to carry.  See, e.g., id. at 13 n.1, quoting Dwyer v. Farrell, 193 Conn. 7, 12 (1984) ("Three States -- Connecticut, Delaware, and Rhode Island -- have discretionary criteria but appear to operate like 'shall issue' jurisdictions. . . .  Although Connecticut officials have discretion to deny a concealed-carry permit to anyone who is not a 'suitable person,' . . . the 'suitable person' standard precludes permits only to those 'individuals whose conduct has

14

shown them to be lacking the essential character of temperament necessary to be entrusted with a weapon'").

Bruen thus simply does not hold that any licensing statute that employs the language "may issue" is unconstitutional.  It is true that the Massachusetts statute, § 131 (d), had a "good reason" requirement prior to the decision in Bruen.  But that provision has since been removed from the statute by amendment, and that (former) provision is irrelevant to the issues the defendant raises here.  The defendant's license was not suspended because he had not shown good cause to obtain or to maintain a license; rather, the defendant's license was suspended because of his actions, by which the chief of police had deemed the defendant to be a risk to public safety.

Whereas the Supreme Court's Bruen decision does not aid the defendant's facial challenge, the Supreme Court's recent decision in Rahimi dooms it.  As part of his facial challenge, the defendant suggests that §§ 131 (d) and (f) must be struck down because they were overbroad -- that is, that they were unconstitutional in some of their applications, even if not unconstitutional as applied to the defendant.  But the Supreme Court made clear in Rahimi that overbreadth doctrine does not apply in this context; rather, to be unconstitutional on its face "a defendant [must] 'establish that no set of circumstances exists under which the Act would be valid.'"  Rahimi, 602 U.S.

15

at 693, quoting United States v. Salerno, 481 U.S. 739, 745 (1987).  This the defendant plainly cannot do.  For example, Rahimi itself validates a firearm regulation that "bars an individual from possessing a firearm if [he is subject to a] restraining order [that] includes a finding that he poses 'a credible threat to the physical safety' of a protected person." Rahimi, supra, quoting 18 U.S.C. § 922(g)(8)(C)(i).  Consistent with Rahimi, pursuant to the unsuitability provisions of §§ 131 (d) and (f), a licensing authority could suspend or revoke a license to carry where a license holder has recently been determined to be a dangerous person in a restraining order proceeding under G. L. c. 209A.  As another example, the statutes explicitly prohibit convicted felons from obtaining licenses; again, such provisions have been approved by the Supreme Court.  See Rahimi, supra at 699, quoting District of Columbia v. Heller, 554 U.S. 570, 626, 627, n.26 (2008) ("many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful'"). Sections 131 (d) and (f) are not unconstitutional on their face.

The defendant also purports to raise an "as applied" challenge, but the argument he presents is no more than a reprise of his facial challenge.  He states that the defendant's "unsuitability determination was made under a highly discretionary standard that does not pass constitutional

16

muster."  The defendant cites no additional case law, and no additional facts, in support of this argument, and for the reasons stated above it is incorrect.  We note as well that it is incorrect to say that the statute's unsuitability standard (as of 2018) was "highly discretionary."  To the contrary, the statute specifically defined unsuitability, requiring, for example, "reliable and credible information that the . . . licensee has exhibited or engaged in behavior that suggests that . . . the . . . licensee may create a risk to public safety." G. L. c. 140, § 131 (d), as amended through St. 2018, c. 123, §§ 11-12.  This definition is narrow, specific, and dovetails with the Supreme Court's approval, in Rahimi, of "firearm laws [that] . . . prevent[] individuals who threaten physical harm to others from misusing firearms."  Rahimi, 602 U.S. at 690.[13] Finally, the defendant does not argue that the facts of his case do not meet the unsuitability standard or cannot be a constitutional basis for suspension of his license.  Indeed, the

---

[13] Prior to Bruen, the Supreme Judicial Court, in Chief of Police of Worcester v. Holden, 470 Mass. 845 (2015), considered a challenge to a prior version of § 131 (d), which contained a less specific unsuitability standard.  The defendant in Holden had his license to carry suspended on the grounds of unsuitability, based on an incident where the defendant engaged in domestic violence.  Id. at 847-848.  The Holden court ruled that § 131 (d) did not violate the Second Amendment, either on its face or as applied.  Id. at 847.  In so ruling the court rejected the argument that the prior version of § 131 (d) conferred excessive discretion on the licensing authority.  See id. at 859-861.

briefs barely mention the facts that led to the license suspension, and our record is incomplete on that issue. The defendant has not carried his burden to show a Second Amendment violation, let alone a substantial risk of a miscarriage of justice.

2. _Lawfulness of possession of ammunition_. The defendant next urges us to overturn his conviction on the grounds that it was not unlawful for him to possess ammunition at the time when the Barre police searched his residence, which was six days after he received the license suspension notice by certified mail. He raises two grounds for this claim: (1) that a "safe-harbor" provision in G. L. c. 140, § 129D, as amended through St. 2014, c. 284, §§ 42-44 (§ 129D),[14] made it lawful for him to possess ammunition during the ninety-day appeal period by G. L. c. 140, § 131 (_f_), as amended through St. 2018, c. 123, §§ 11-12 (§ 131 [_f_]),[15] and (2) that the requirement under § 129D to surrender ammunition "without delay" was unconstitutionally vague. We take each issue in turn.

a. _Applicability of safe-harbor provision_. To begin, the defendant is incorrect that he was entitled to a ninety-day

_____

[14] This safe-harbor provision also has been removed from the statute. See G. L. c. 140, § 129D.

[15] The appeal procedure is now contained within G. L. c. 140, § 121F (_v_) (2).

18

grace period before turning in his licenses and firearms. It is true that as of 2018 there was a discrepancy in the statutes, between §§ 129D and 131 (f). The Supreme Judicial Court resolved that discrepancy, however, in Commonwealth v. Adams, 482 Mass. 514, 533-534 (2019). There the court harmonized §§ 131 (f) and 129D by ruling that the licensing scheme gives a licensing authority two options when suspending or revoking a firearms license. Id. at 533. Under the first option, a licensing authority can suspend a license and order immediate surrender of firearms, in which case the licensee cannot obtain a stay of the suspension and the surrender obligations even if the licensee appeals the suspension under § 131 (f). Id. at 533-534. Alternatively, a licensing authority could suspend a license without seeking immediate surrender of the licensee's firearms, in which case a licensee could stay the obligation to surrender firearms if the licensee appealed the suspension order. Id. at 534.

The defendant argues that his obligation to turn over his firearms "without delay" should have been stayed under the circumstances, because (he claims) the licensing authority sent his notice of the suspension only by certified mail, and thus did not order "immediate surrender" per Adams. See Adams, 482 Mass. at 533. This argument fails for two reasons. First, the defendant never appealed the suspension. Thus, regardless of

19

which method of revocation the licensing authority used, the defendant had no basis for a stay under Adams.  Second, the Barre police in fact used the first Adams method and required immediate surrender, as the certified letter sent to the defendant required the defendant "to turn in . . . without delay, your firearms license(s) and all firearms . . . and ammunition."  Thus, under no circumstance was the defendant entitled to a stay of his obligation to turn over his ammunition without delay.

b.  Vagueness of § 129D.  The defendant also argues that "without delay," as used in § 129D, is unconstitutionally vague.  A statute is unconstitutionally vague if it does not provide "(1) a reasonable opportunity for a person of ordinary intelligence to ascertain what the statute prohibits; and (2) comprehensible standards that limit prosecutorial and judicial discretion and thus avoid discriminatory or arbitrary enforcement."  Commonwealth v. Brown, 481 Mass. 77, 84 (2018).  There is no such vagueness here, where "without delay" has a common meaning that provides a person of ordinary intelligence a reasonable opportunity to understand what is prohibited.  See id.  "Without delay" means "immediately," or as near thereto as can reasonably be accomplished.  The defendant admitted as much at the scene of the search, when he stated that "without delay"

20

meant "as soon as humanly possible."  The term "without delay" is not unconstitutionally vague.

3.  _Alleged improper testimony_.  The defendant also argues that his conviction must be reversed because Officer Recos testified that certain items seized during the search of the defendant's residence were "ammunition."  The defendant alleges that this testimony was improper lay opinion, and that it asserted his guilt as to the ultimate issue in the case.  We disagree.

First, the defendant is incorrect that his assented-to motion in limine that was allowed prior to trial excluded Recos's testimony.  The defendant's motion in limine sought to exclude opinion testimony only as to the ultimate issue in the case -- that is, "purported opinion testimony, whether lay or expert . . . that the items seized . . . meet the definition of 'ammunition.'"  Leaving aside the question whether such a motion in limine has merit, Recos's testimony that he was familiar with the evidence before him, because it was "ammunition" seized from the defendant, did not constitute "testimony . . . that the items seized from Derek Mancevice meet the definition of ammunition," and thus did not fall within the ambit of the motion in limine.

Furthermore, although defense counsel did object on one occasion to Recos's use of the term "ammunition," prior to that

21

objection Recos had testified at least two other times that he found "ammunition" when searching Mancevice's apartment, without objection. Thus, the additional reference to "ammunition" was merely cumulative of evidence admitted without objection and was not prejudicial. See Commonwealth v. Barnoski, 418 Mass. 523, 539 n.12 (1994).

4. Sufficiency of the evidence of ammunition. Finally, the defendant argues that his conviction must be overturned because the evidence was insufficient to prove that the items seized from him met the legal definition of ammunition. In reviewing the sufficiency of the evidence, we take the evidence in the light most favorable to the Commonwealth, and determine whether a rational jury could have found the requisite elements of the crime beyond a reasonable doubt. Commonwealth v. Latimore, 378 Mass. 671, 677-678 (1979).

Here, the evidence was sufficient to allow a rational jury to find that the items seized were ammunition as defined by G. L. c. 269, § 10 (o), as amended through St. 2014, c. 284, § 90. The Commonwealth had to show only that the items were "cartridges or cartridge cases, primers (igniter), bullets or propellant powder designed for use in any firearm, rifle or shotgun," id., and the Commonwealth could do so by relying upon "percipient evidence and the fact finder's common sense and life experience." Commonwealth v. Velez, 82 Mass. App. Ct. 12, 18

22

(2012). Expert testimony was not required. See id. Here, the items themselves were entered into evidence, without objection. They included bags with manufactured labels stating "black rifle powder," as well as a box of one hundred metal objects that appear to be bullets. The items were placed in evidence bags, and several were identified as ammunition by attached police evidence labels, including labels describing "green box w/ 22 assort. rounds of ammo" and ".22 caliber rounds," among others. Furthermore, the defendant essentially admitted at the scene of the search that what was seized from his apartment was ammunition by stating, in response to Officer Recos's question why the defendant had not turned over his ammunition, that "he wasn't able to get every little piece that he owned and turn it in." Taking the evidence in the light most favorable to the Commonwealth, a rational jury could find that the items met the statutory definition of ammunition.

Judgment affirmed.

By the Court (Sacks, Englander & Grant, JJ.[16]),

Clerk

Entered: January 21, 2025.

---

[16] The panelists are listed in order of seniority.