NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12345


COMMONWEALTH  vs.  CHRISTOPHER J. KENNEDY.



Hampshire.     October 3, 2017. - February 9, 2018.

Present (Sitting at Greenfield):  Gants, C.J., Gaziano, Lowy,
Budd, & Kafker, JJ.


Indecent Assault and Battery.  Indecent Exposure.  Assault and
    Battery.  Mistake.  Practice, Criminal, Instructions to
    jury, Jury and jurors, Voir dire, Challenge to jurors.
    Jury and Jurors.  Evidence, First complaint.



Indictments found and returned in the Superior Court
Department on October 15, 2014.

The cases were tried before Daniel A. Ford, J.

The Supreme Judicial Court granted an application for
direct appellate review.


Merritt Schnipper for the defendant.
Cynthia M. Von Flatern, Assistant District Attorney, for
the Commonwealth.
The following submitted briefs for amici curiae:
David Rangaviz, Committee for Public Counsel Services, for
Committee for Public Counsel Services.
Thomas J. Carey for Kari Hong & others.
Wendy J. Murphy for Women's and Children's Advocacy Project
at New England Law|Boston.

GAZIANO, J.  A Superior Court jury convicted the defendant of indecent assault and battery on a person over fourteen, G. L. c. 265, § 13 H, assault and battery, G. L. c. 265, § 13 A (a), and indecent exposure, G. L. c. 272, § 53.  The charges stemmed from an encounter between the victim, M.M., and the defendant, a State trooper, who met on a dating Web site and exchanged flirtatious messages.  They arranged to meet in person for coffee, and M.M. agreed to the defendant's suggestion that they finish their conversation at her apartment.  Once inside, the defendant exposed himself to M.M.  She immediately informed the defendant that he had the wrong idea, and repeatedly told him, "No."  Despite M.M.'s requests to stop, the defendant advanced toward her, grabbed her wrist, and forced her to touch his penis.  She told him, "No means no," and that he had to leave. He then apologized and left the apartment.

At trial, the defendant requested a jury instruction on mistake of fact, asserting that he honestly and reasonably had believed that M.M. had consented to the contact leading to the charges, and would not have been offended by his act of exposing himself.  The request was denied.  The defendant appeals from the denial and from the admission of what he asserted was unnecessary first complaint evidence.  We conclude that the trial judge did not err in declining to give an instruction on mistake of fact for either the charge of indecent assault and

battery or the charge of indecent exposure.  The judge also did not err in allowing the admission of the challenged testimony.

This case also presents the issue of the extent to which a judge has discretion to question prospective jurors following attorney-conducted voir dire, and to rule on challenges for cause.  The defendant contends that the answers provided by the prospective jurors when questioned by the judge were not sufficient to address issues of bias raised during attorney-conducted voir dire on the same topics, and that the judge erred by refusing to excuse the jurors for cause.  We conclude that the judge did not abuse his discretion either in asking follow-up questions or in his rulings that the jurors were impartial.  Accordingly, we affirm the defendant's convictions.[1]

1.  <u>Facts</u>.  The jury could have found the following.  The defendant first contacted M.M. on a dating Web site in June, 2014.  Over the following week, the defendant and M.M. exchanged messages through the Web site and via text messages on their cellular telephones, with both of them sending multiple flirtatious and explicit messages.  They also spoke on the telephone at least once.  Early on in these exchanges, the defendant told M.M. that he was a State trooper who was

---

[1] We acknowledge the amicus briefs submitted by the Committee for Public Counsel Services; Kari Hong, Brooke Kootman, and Nicholas Dodson; and the Women's and Children's Advocacy Project at New England Law|Boston.

separated from his wife, but was still living in the same house with her for financial reasons. M.M., who was separated from her husband, said that his "situation," as he had portrayed it, was not a "deal breaker" for her.

As the relationship progressed, M.M. became suspicious that the defendant was trying to cheat on his wife, a suspicion that he denied. They continued to send each other explicit messages and to try to find a time at which they could meet in person. Both said that they were working long hours and looking for someone "to spend time with on a casual basis."

In July, 2014, the defendant offered to meet M.M. at a coffee shop next to a gasoline station in Williamsburg on her way home from work. M.M. told the defendant she could meet him for a short period of time while getting gasoline, but that she had promised to help her landlord with some work. M.M. testified at trial that she did need to get gasoline, but she had no plans with her landlord, and that she simply "wanted an excuse to just cut it off" if she decided to leave. She wanted an opportunity to meet the defendant face to face in order "to see what the situation really was" with his wife.

While at the gasoline pumps, M.M. saw the defendant arrive in uniform in a police cruiser and enter the coffee shop. She moved her vehicle next to his and began a conversation with him in the parking lot. M.M. and the defendant discussed their

relationships with their spouses and otherwise had "a friendly conversation" in which they "were shooting the breeze."  M.M. testified at trial that she felt comfortable with the defendant and was not intimidated.  They spoke for approximately ten minutes and then M.M. said she had to leave.  The defendant told M.M. that he was enjoying their conversation and asked if he could go back to her house with her to finish the coffee and the conversation.  M.M. agreed, and he followed her vehicle as she drove home.

When M.M. and the defendant arrived at M.M.'s apartment, three of her landlords' children were in the swimming pool. M.M. asked the defendant to wait outside for a minute so that she could put away laundry that was hanging up inside.  M.M. then told the defendant he could come in.

As the defendant walked into M.M.'s apartment, he started walking toward her and unzipped his pants.  He pulled out his penis and said, "I want you to see what you're doing to me." M.M. responded, "No.  This isn't what I thought was going to happen here," but the defendant continued to walk towards her with his penis exposed.  M.M. continued to say "no" and "no means no" as the defendant reached for her wrist and forced her to touch his penis.  She tried to pull away, but her back was against the kitchen counter.  The defendant kissed M.M. until she turned her head away.  He then backed off, and M.M. said,

"You need to fucking leave." The defendant zipped his pants, apologized, and said that he would leave. On his way out, the defendant asked M.M. if she was going to report him. The defendant had been inside M.M.'s apartment for approximately five minutes.

A few minutes after the defendant left, M.M. sent a text message to a friend, J.D.,[2] to tell her what had happened. She then spoke to J.D. on the telephone and sent text messages to several other friends. That night, M.M. telephoned both the Worthington and Williamsburg police departments, and left voice mail messages. The next morning, not having heard from either police department, M.M. called 911.

The defendant sent M.M. a text message that afternoon, asking how her day was going, but M.M. did not respond. At some point that day, the defendant removed his profile from the dating Web site. The defendant was arrested and charged with indecent assault and battery, indecent exposure, and assault and battery.

All of the messages between M.M. and the defendant were introduced at trial through M.M.'s testimony.[3] In addition, the jury heard testimony from J.D. as a first complaint witness, and

---

[2] A pseudonym.

[3] The prosecutor presented M.M. with copies of the messages while she was on the stand and she testified from those copies.

testimony from State trooper Robin Whitney and Northampton police Detective Michael Briggs concerning the investigation.

At the close of all the evidence, defense counsel requested a jury instruction on mistake of fact for the charges of indecent assault and battery and indecent exposure.[4] The judge declined to give the instructions. On the charge of indecent assault and battery, he decided that the current state of the law does not require that a defendant intend that the touching

---

[4] The defendant proposed the following mistake of fact instruction for indecent assault and battery:

"You must also consider whether a reasonable person in [the defendant's] situation, considering all of the circumstances, could have been reasonably mistaken about whether [M.M.] consented to any touching that the Commonwealth has proven beyond a reasonable doubt. Again, because the Commonwealth always bears the burden of proof of all elements of the offenses by proof beyond a reasonable doubt, if after considering all of the evidence you have a reasonable doubt as to whether a person in [the defendant's] situation reasonably could have been mistaken about whether [M.M.] consented to the touching at issue, the defendant is entitled to the benefit of that reasonable doubt and must be acquitted."

The defendant proposed the following instruction for the charge of indecent exposure:

"If you find beyond a reasonable doubt the defendant exposed his genitals, you should then consider whether a reasonable person in [the defendant's] position, considering all the circumstances, might have been mistaken as to whether exposing his genitals would be offensive to [M.M.]. Keep in mind that the burden of proof is always on the Commonwealth, so the Commonwealth has to prove beyond a reasonable doubt that a reasonable person in [the defendant's] position, considering all of the circumstances, could not have been mistaken as to whether [M.M.] would find the exposure of his genitals offensive."

be without consent and, therefore, a mistake of fact as to consent was both irrelevant and not supported by the facts in this case. The judge similarly ruled that giving the instruction for the charge of indecent exposure would add an element not otherwise required by current jurisprudence, although he acknowledged that this court has not addressed the issue of mistake of fact for indecent exposure. He observed that the facts in this case may support a mistake of fact defense for the charge of indecent exposure.

The defendant was convicted of all three offenses. He appealed from his convictions, and we allowed his application for direct appellate review.

2. Discussion. The defendant challenges his convictions on three bases: (1) the jury should have been instructed on mistake of fact for both indecent assault and battery and indecent exposure where he reasonably believed that M.M. had consented to the touching and would not be offended by his exposure; (2) the judge should not have allowed first complaint testimony from J.D. and "a related category of evidence" from the investigating officers; and (3) the judge incorrectly refused to dismiss for cause two members of the venire who had indicated bias during attorney-conducted voir dire.

a. Mistake of fact instruction. Because the defendant requested mistake of fact instructions for the indictments

alleging indecent assault and battery and indecent exposure, and objected to the judge's ruling, we review for prejudicial error. Commonwealth v. Kelly, 470 Mass. 682, 687 (2015).

A mistake of fact instruction "is available where the mistake negates the existence of a mental state essential to a material element of the offense." Commonwealth v. Lopez, 433 Mass. 722, 725 (2001). See Commonwealth v. Liebenow, 470 Mass. 151, 161-162 (2014) (allowing mistake of fact instruction for charge of larceny where defendant thought property was abandoned); Commonwealth v. Kenney, 449 Mass. 840, 857 (2007) (defendant may present evidence of honest mistake about age of child depicted in pornographic material); Commonwealth v. Vives, 447 Mass. 537, 540-541 (2006) (defendant entitled to jury instruction on defense of honest and reasonable belief that he was collecting debt to refute element of intent to steal). See also Lopez, supra at 725-726, quoting Model Penal Code § 2.04(1)(a) (1985) (ignorance or mistake of fact is defense "if . . . the ignorance or mistake negatives the purpose, knowledge, belief, recklessness or negligence required to establish a material element of the offense").

In Lopez, 433 Mass. at 727-728, we held that a defendant charged with rape is not entitled to raise a defense of an honest and reasonable mistake as to the victim's consent, noting that our rape statute, G. L. c. 265, § 22, does "not require

proof of a defendant's knowledge of the victim's lack of consent or intent to engage in nonconsensual intercourse." A defendant need only intend to perform the act by force or threat of force. Id. at 728-729. Because the Commonwealth is not required to prove that a defendant intended the intercourse be without consent, "a mistake of fact as to that consent cannot . . . negate a mental state required for the commission of the prohibited conduct." Id. at 728.

We further determined that requiring the Commonwealth to prove that a defendant "compelled the victim's submission by use of force; nonphysical, constructive force; or threat of force" negates "any possible mistake as to consent." Id. at 729. In so holding, we observed that a mistake of fact defense has the potential to "eviscerate the long-standing rule in this Commonwealth that victims need not use any force to resist an attack." Id. A rape victim need not fend off attackers with physical force "in order to communicate an unqualified lack of consent to defeat any honest and reasonable belief as to consent." Id.

Nonetheless, we concluded our analysis by acknowledging that a mistake of fact defense as to consent might, in some circumstances, be appropriate. Accordingly, we left open the possibility of its use in "a future case where a defendant's

claim of reasonable mistake of fact is at least arguably supported by the evidence."  Id. at 732.

Seven years later, in Commonwealth v. Blache, 450 Mass. 583, 594 (2008), we considered whether a defendant charged with raping someone incapable of consenting to intercourse (due to intoxication) was entitled to an instruction on mistake of fact. Because the Commonwealth is not required to prove the use of force beyond that necessary for penetration, "the possibility of a defendant's reasonable mistake about the complainant's consent could increase, creating the potential for injustice."  Id.  We held that "in such a case the Commonwealth must prove that the defendant knew or reasonably should have known that the complainant's condition rendered her incapable of consenting to the sexual act."  Id.

i.  Indecent assault and battery on a person over fourteen. To prove indecent assault and battery on a person over fourteen, the Commonwealth is required to establish that the defendant committed "an intentional, unprivileged, and indecent touching of the victim."  Commonwealth v. Marzilli, 457 Mass. 64, 67 (2010), overruled on another grounds by Commonwealth v. Brie, 473 Mass. 754 (2016), quoting Commonwealth v. Mosby, 30 Mass. App. Ct. 181, 184 (1991).  The intent element is satisfied upon proof that "the defendant intended -- had a conscious purpose . . . -- to commit an indecent or offensive touching without

[the victim's] consent" (citation omitted).  <u>Marzilli</u>, <u>supra</u>.
See <u>Commonwealth</u> v. <u>Burke</u>, 390 Mass. 480, 482-484 (1983) (lack
of consent is element of indecent assault and battery where
victim is over age fourteen).

The defendant contends that sexual assaults involving an
adult victim, like indecent assault and battery on a person over
the age of fourteen, which do not require proof of the use of
force, and whose criminality depends on the victim's lack of
consent, are subject to a mistake of fact defense.  In an
attempt to equate this case to the circumstances in <u>Blache</u>, he
argues, "The principles underlying this rule are as applicable
to cases like the defendant's which involve allegations of
brief, offensive touching and non-contact exposure, as they are
to cases involving an alleged victim's incapacity, since in both
situations the key question is what a defendant understood about
another's wishes in the absence of clear, objective indicia of
consent or non-consent."

The problem with this claim is not the defendant's legal
argument.  Rather, it is that, here, M.M. did provide clear,
objective indicia of nonconsent.  She said, "No."  The
defendant, undeterred by M.M.'s statement of nonconsent,
persisted by moving closer to her as she continued to say "no."
At one point, M.M. even said, "No means no," and held her hands
up in the air in front of her.  The defendant continued to

advance toward her and backed her up against a kitchen counter where she could no longer move away.  He reached out and grabbed her hand and pulled it toward his penis as she tried to pull her hand away.  M.M.'s indications of non-consent were abundantly clear.  A defendant who ignores a victim's clear and unambiguous pleas to stop does not raise a legitimate claim of mistake of fact as to consent.

The prior communications from M.M., regardless of their flirtatious or sexually explicit content, were not sufficient to support a mistake of fact instruction.  "The law of rape is not a part of the law of contracts.  If on Friday you manifest consent to have sex on Saturday, and on Saturday you change your mind but the man forces you to have sex with him anyway, he cannot use your Friday expression to interpose, to a charge of rape, a defense of consent or of reasonable mistake as to consent."  Tyson v. Trigg, 50 F.3d 436, 448 (7th Cir. 1995), cert. denied, 516 U.S. 1041 (1996).

We continue to adhere to our decision in Lopez, and hold open the possibility that a mistake of fact instruction may be an appropriate and fair defense to charges of indecent assault and battery on a person over fourteen.  See Lopez, 433 Mass. at 732.  On these facts, however, we agree with the judge that the defendant was not entitled to an instruction on mistake of fact.

ii.  Indecent exposure.  The crime of "[i]ndecent exposure requires proof of an intentional act of lewd exposure, offensive to one or more persons" (quotations and citation omitted).[5] Commonwealth v. St. Louis, 473 Mass. 350, 364 (2015).  "The exposure of one's genitalia is a necessary element to indecent exposure."  Id.  Offensive acts are those that cause "displeasure, anger or resentment, and are repugnant to the prevailing sense of what is decent or moral" (quotations and citation omitted).  Id.  See Commonwealth v. Bishop, 296 Mass. 459, 460, 462 (1937) (evidence sufficient to support conviction of indecent exposure where defendant was in his bedroom but intentionally exposed himself to his neighbor by flashing mirror to get her attention).[6]

---

[5] The crime of indecent exposure is a misdemeanor punishable by imprisonment in a house of correction for up to six months, a fine, or both imprisonment and a fine.  See G. L. c. 272, § 53. The crime of open and gross lewdness and lascivious behavior, by contrast, requires proof that a defendant intentionally exposed him or herself in a manner designed to "shock" or "alarm" one or more persons, and is a felony punishable by incarceration in a State prison.  See G. L. c. 272, § 16; Commonwealth v. Maguire, 476 Mass. 156, 158 (2017), citing Commonwealth v. Fitta, 391 Mass. 394, 396 (1984).

[6] The judge instructed the jury in accordance with Instruction 7.340 of the Criminal Model Jury Instructions for Use in the District Court (2009).  He stated, "To prove guilt on this offense, the Commonwealth must prove three . . . essential elements beyond a reasonable doubt.  Number one, that the defendant exposed his genitals to one or more persons, and in this case [M.M.]; number two, that the defendant did so intentionally; and number three, that the person to whom he

To raise a defense of mistake of fact, the defendant would have been required to demonstrate that his mistaken belief negated the culpability required for conviction of the crime of indecent exposure.  See Lopez, 433 Mass. at 728.  Here, the Commonwealth bore the burden of proving that the defendant intentionally exposed his genitalia to M.M.  Commonwealth v. Broadland, 315 Mass. 20, 21-22 (1943).  See, e.g., Commonwealth v. Swan, 73 Mass. App. Ct. 258, 261-262 (2008) (sufficient evidence of defendant's intent to expose himself in public school bathroom).  The Commonwealth did not have to prove that the defendant intended to offend M.M.  Cf. St. Louis, 473 Mass. at 364 (mens rea for crime of indecent exposure consists of intentional exposure of genitalia).  Thus, the defendant's belief (whether reasonable or not) that M.M. would not be offended by the display of his penis did not negate a mental state required for commission of the crime of indecent exposure.

Moreover, in these circumstances, we discern no reason that a mistake of fact instruction was necessary to prevent an injustice.  See Lopez, 433 Mass. at 728 (discussing necessity of mistake of fact instruction in interests of justice).  As stated, M.M. reacted to the defendant's act of exposure by informing him, "No, this isn't what I thought was going to

exposed himself was offended by the defendant's thus exposing himself."

happen here."  She also told the defendant, "No means no."  The defendant ignored her statements and advanced toward her with his penis exposed.  Therefore, regardless of any possible misunderstanding by the defendant of the circumstances when he entered the apartment, M.M.'s subsequent negative reaction vitiated any belief, whether reasonable or otherwise, that M.M. was not offended by the defendant's act of exposure, and the defendant continued his actions in the face of M.M.'s repeated protests.

In sum, there was no error in the trial judge's decision to deny the defendant's request for an instruction on mistake of fact.

b.  <u>First complaint testimony</u>.  The defendant asserts that the judge improperly allowed J.D.'s objected-to first complaint testimony, because there was no need for the first complaint testimony to rebut any possibility that the victim's delay in reporting suggested that the crime had not in fact occurred. The defendant argues also that Whitney and Briggs should not have been allowed to testify as to the investigative process, because their testimony in effect served as additional first complaint testimony and unfairly buttressed the Commonwealth's case.[7]

---

[7] The defendant did not object at trial to the investigative testimony by Whitney and Briggs, so we review that testimony for

We clarified in Commonwealth v. Aviles, 461 Mass. 60, 73 (2011), that the standard of review for admission of first complaint evidence is abuse of discretion.

i. Testimony by the victim's friend. The defendant argues that the judge abused his discretion by not evaluating fully the particular circumstances of this case in deciding whether to allow admission of the evidence. As the defendant notes, our modification of the first complaint doctrine in Commonwealth v. King, 445 Mass. 217, 243 (2005), cert. denied, 546 U.S. 1216 (2005), acknowledged the risk of "unfairly enhanc[ing] a complainant's credibility as well as prejudic[ing] the defendant by repeating for the jury the often horrific details of an alleged crime."

We addressed that risk, however, by limiting first complaint testimony to one witness in order to prevent "piling on," allowing defendants to cross-examine that witness and the complainant, and encouraging judges "to curtail direct or cross-examination to avoid any undue prejudice." Id. at 245. Additionally, "[f]irst complaint testimony may be admitted for a limited purpose only, to assist the jury in determining whether to credit the complainant's testimony about the alleged sexual

---

a substantial risk of a miscarriage of justice. See Commonwealth v. McCoy, 456 Mass. 838, 845-846 (2010).

assault."  Id. at 219.  "The testimony may not be used to prove the truth of the allegations."  Id.

The first complaint doctrine is intended to accomplish two goals:  "to refute any false inference that silence is evidence of a lack of credibility on the part of rape complainants," id. at 243, and "to give the jury as complete a picture as possible of how the accusation of sexual assault first arose," id. at 247.  The defendant seeks to limit this doctrine in cases involving an adult complainant to situations where the complainant delayed reporting, which might tend to suggest fabrication.  Questions involving a complainant's credibility, however, may be at issue even absent any delay in disclosure.  "There is a continued need in sexual assault cases to counterbalance or address inaccurate assumptions regarding stereotypes about delayed reporting of a sexual assault or about sexual assault victims in general."  Id. at 240.

M.M. sent a text message to J.D. shortly after the incident with the defendant to tell her what had happened.  J.D.'s testimony about this text message is a textbook example of the reasons for permitting first complaint testimony, and provided the jury with a contemporaneous description of the victim's reaction to the defendant's actions.  The judge properly limited J.D.'s friend's testimony, and did not permit her to discuss the content of the telephone call she had with M.M. after having

received the text message. In addition, he twice instructed the jury on the limited purpose of J.D.'s testimony. There was no abuse of discretion.

ii. Investigative testimony by Whitney and Briggs. There also was no error in allowing the investigative testimony by Whitney and Briggs. While the first complaint doctrine prohibits "piling on" of additional complaint witnesses, "it does not exclude testimony that 'is otherwise independently admissible' and serves a purpose 'other than to repeat the fact of a complaint and thereby corroborate the complainant's accusations.'" See Commonwealth v. McCoy, 456 Mass. 838, 845 (2010), quoting Commonwealth v. Arana, 453 Mass. 214, 220-221, 229 (2009). But see Commonwealth v. Stuckich, 450 Mass. 449, 457 (2008) (fact that Commonwealth "brought resources to bear on this incident creates the imprimatur of official belief in the complainant" and may be prejudicial; jury do not "need to know how the complaint of abuse evolved into the case before them").

Whitney testified that she met with M.M., reviewed the messages sent between M.M. and the defendant, was present when photographs of M.M.'s apartment were taken, applied for a search warrant for the defendant's personal cellular telephone, obtained surveillance video -- that was played for the jury during Whitney's testimony -- of the in-person meeting between M.M. and the defendant at the gasoline station, and was aware of

subpoenaed information on the two accounts used by M.M. and the defendant on the dating Web site. Briggs testified that he used forensic software to acquire the contents of M.M.'s cellular telephone, including text messages and call logs. He then explained how to read the information on the resulting records.

None of the testimony of the officers reiterated M.M.'s accusations or enhanced her credibility by suggesting that the officers believed her. See McCoy, 456 Mass. at 851-852. The testimony simply described how different exhibits were obtained. Such testimony may have been repetitive, particularly because the messages and photographs had been admitted in evidence. While the first complaint doctrine exists to prevent the appearance of buttressing a victim's allegations, here, the testimony by the investigating officers was not a "piling on" of first complaint evidence. See id. at 845. Contrast Stuckich, 450 Mass. at 456-457.

c. Jury empanelment. The defendant also challenges the judge's refusal to excuse for cause two members of the venire who, the defendant contends, had admitted to bias during attorney-conducted voir dire. The judge ultimately denied the defendant's request to excuse those two jurors for cause after asking them follow-up questions to determine whether any potential bias would affect their ability to be fair and impartial in judging the defendant's guilt. The defendant used

peremptory challenges to remove the two prospective jurors, and then properly preserved for the record his inability to use an additional peremptory challenge on a juror who had been seated and then deliberated.

"When a defendant uses a peremptory challenge to excuse a juror that the judge refused to excuse for cause and the defendant is later 'forced to accept a juror whom he otherwise would have challenged peremptorily' . . . the correctness of the judge's refusal to excuse the former juror for cause is preserved for review" (citation omitted). Commonwealth v. Clark, 446 Mass. 620, 629 (2006). "If the judge's refusal to excuse the juror for cause is determined to be error, the defendant is entitled to a new trial without a showing of prejudice." Id.

The first juror, juror no. 27, originally indicated, in response to the prosecutor's questions, that her ability to be fair and impartial might be affected by the defendant having worn his uniform at the time of the alleged crime. In response to defense counsel's questions, she continued to suggest that her judgment might be affected by that evidence, and also said that she would be affected by evidence that the defendant was married and seeking a sexual encounter with someone who was not his wife. The judge then posed some additional questions to the juror:

The judge:  "How would it [a]ffect you?"

The juror:  "If he was married and an officer and he went to have sexual relations with someone else or relations, I don't agree with it."

The judge:  "Whether you agree with it or not, would it affect your ability as to whether he committed a crime?"

The juror:  "No, no."

The judge:  Well, that's the issue.  The Commonwealth says he committed a crime.

The juror:  "Yeah."

The judge:  "The issue is would the fact that he was wearing a uniform and went to this place in a cruiser affect your ability to judge whether or not he committed the crime . . . when he got there."

The juror:  "I guess not.  I guess no."

The judge:  "It would not?"

The juror:  "No."

The judge found juror no. 27 indifferent and denied the defendant's  request to excuse her for cause.

The second challenged juror, juror no. 37, said that she would not be affected by the defendant having worn a uniform or having driven a police vehicle, so long as he was off duty, but indicated that the defendant's being married might affect her ability to be fair and impartial:  "I have a very close girl friend in that predicament right now.  Her husband is cheating on her, so I am empathetic to her and I am not sure I could

separate that, hearing the case like this. . . . I don't know, it may color how I hear the details."

The judge again asked clarifying questions:

The judge:  "Do you think it would affect your ability to judge whether or not the Commonwealth can prove him guilty of committing a crime?"

The juror:  "I would hope not.  I would hope I could separate the two."

The judge:  "Well, that is the issue."

The juror:  "Correct.  Correct."

The judge:  "If he was cheating on his wife, I think we all can agree, that was not a good thing."

The juror:  "Correct."

The judge:  "But would that affect -- that fact, alone, make you more likely to convict him?"

The juror:  "No."

The judge:  "Can you be fair to him, even though he may have been cheating on his wife, in regard to these charges?"

The juror:  "I believe so."

The judge found juror no. 37 indifferent and denied a request to excuse her for cause.  The defendant argued that the judge's follow-up questions were designed to provide answers "the court wants."  The judge explained, "It's not a matter of what the court wants; it's a matter of getting to the point.  The point is whether [the juror] can be fair to the defendant and judge

the case with an open mind, whether or not [the juror] think[s] he was cheating on his wife."[8]

The defendant contends that attorney questioning had uncovered "real indicia of bias from [j]urors [nos.] 27 and 37." He argues that the judge's follow-up questions were inadequate because the judge failed fully to explore the jurors' conflicting responses on questions of potential bias. In the defendant's view, the judge was required "[a]t a minimum . . . to ask why each potential juror had changed answers depending on the identity of her questioner." We do not agree.

A trial judge has considerable discretion in conducting the process of jury selection. See Commonwealth v. Andrade, 468 Mass. 543, 547 (2014); Clark, 446 Mass. 629-630. It is the judge's obligation to "examine jurors fully regarding possible bias or prejudice where it appears that there is a substantial risk that jurors may be influenced by factors extraneous to the evidence presented to them" (quotations and citation omitted).

_____

[8] After attorney questions and his own follow-up questions, the judge sua sponte excused nine prospective jurors he determined likely would be unable to be fair and impartial. The judge also allowed one of the Commonwealth's challenges for cause when the prospective juror indicated that evidence that M.M. and the defendant met through a dating Web site, and that the defendant was cheating on his wife, might affect his ability to be fair and impartial. After the jury had been seated, the judge asked the entire panel "one more time" whether anyone wanted to change his or her answer to any of the questions or had "any issue or problem . . . relative to serving on [the] case as fair and impartial jurors."

See Commonwealth v. Perez, 460 Mass. 683, 688 (2011). Nothing in the process of attorney-conducted voir dire restricts a judge's exercise of his or her broad authority to ask prospective jurors appropriate questions designed to determine whether the juror is impartial. See G. L. c. 234A, §§ 67A-67D, inserted by St. 2016, c. 36 § 4; Commonwealth v. Pytou Heang, 458 Mass. 827, 856, (2011), quoting Commonwealth v. Garuti, 454 Mass. 48, 52 (2009) (judge shall examine prospective jurors to determine if extraneous issues impact ability to stand indifferent); Rule 6(1) of the Rules of the Superior Court (2017) (trial judge has discretion to determine procedure for selection of impartial jurors).

We discern no error in the judge's inquiry in this case. He was required to determine whether jurors nos. 27 and 37 were capable of setting aside their own opinions, weighing the evidence without considering extraneous issues, and following his legal instructions. See Commonwealth v. Bryant, 447 Mass. 494, 501 (2006); Commonwealth v. Stroyny, 435 Mass. 635, 639 (2002). Juror no. 27 expressed concerns about the allegation that the defendant committed a crime while in uniform and driving a police cruiser, as well as concerns about the defendant's infidelity. The judge asked the juror how the extramarital affair would affect her. After clarifying that she did not approve of the defendant's infidelity, the juror stated

that those feelings would not affect her decision "on whether the defendant had committed a crime." In response to the judge's inquiry, juror no. 27 also stated that the defendant's wearing a uniform and driving a police cruiser would not affect her decision-making. Similarly, juror no. 37 told the attorneys that she was bothered by allegations that the defendant was cheating on his spouse. The judge asked more specific questions about this subject, and that juror answered that evidence of the defendant's infidelity would not prevent her from being a fair juror.

We conclude that the judge did not abuse his discretion in denying the challenges for cause. See Commonwealth v. Lattimore, 396 Mass. 446, 450 n.6 (1985) (judge who observes prospective juror is in best position to determine whether follow-up questions are warranted). Jurors nos. 27 and 37 affirmatively stated, and demonstrated, to the judge's satisfaction, an ability to set aside personal dislike of some aspect of the defendant's actions, such as marital infidelity, and impartially decide the case. See Commonwealth v. Ruell, 459 Mass. 126, 136, cert. denied, 565 U.S. 841 (2011) (judge vested with broad discretion in deciding whether prospective juror is impartial). Contrast Commonwealth v. Vann Long, 419 Mass. 798, 804 (1995) (error where juror never answered unequivocally that he could put aside ethnic bias against defendant); Commonwealth

v. <u>Auguste</u>, 414 Mass. 51, 57-58 (1992) (judge's inquiry failed to ascertain whether juror would be impartial).  We see no reason to disturb the judge's determination.

<u>Judgments affirmed</u>.