NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

19-P-352                                        Appeals Court

COMMONWEALTH  vs.  BRIAN BUTLER.

No. 19-P-352.

Essex.      December 10, 2019. - March 26, 2020.

Present:  Wolohojian, Agnes, & Neyman, JJ.


Indecent Assault and Battery.  Mistake.  Consent.  Evidence,
     State of mind, Relevancy and materiality.  Police Officer.


     Indictment found and returned in the Superior Court
Department on November 30, 2016.

     The case was tried before Hélène Kazanjian, J.


     Robert L. Sheketoff for the defendant.
     Kenneth E. Steinfield, Assistant District Attorney, for the
Commonwealth.


     WOLOHOJIAN, J.  The primary issue in this appeal is whether

the defendant, who was convicted of indecent assault and

battery, G. L. c. 265, § 13H, was entitled to a mistake of fact

as to consent instruction.  Although the Supreme Judicial Court

"hold[s] open the possibility that a mistake of fact instruction

may be an appropriate and fair defense to charges of indecent

assault and battery on a person age fourteen or older,"
Commonwealth v. Kennedy, 478 Mass. 804, 811 (2018), we conclude
that the trial judge did not err in declining to instruct on the
defense because any subjective belief the defendant may have
held as to the victim's consent was, in the facts and
circumstances here, objectively unreasonable as a matter of law.

Background.  The defendant was a Salem police officer.
When he reported to the police station shortly before 7 A.M. on
November 1, 2016, the victim, whom we shall call James, was
being held in protective custody.  James, who was in his late
twenties and lived on Cape Cod with his mother, had been brought
to the station about three and one-half hours earlier, drunk and
wearing nothing other than a pair of saturated jeans and some
Halloween makeup.[1]  Much of what subsequently occurred at the
station was captured (both audio and video) by cameras located

---

[1] James had come to Salem with his sister and her boyfriend
to participate in Halloween activities.  By the end of the
evening, James had become intoxicated to the point that he left
the shower in the hotel room running, the tub overflowed, and
there were several inches of water flooding both the bathroom
and the bedroom.  James was belligerent towards his sister and
her boyfriend, who called the police.  The responding officer
saw that James was unsteady on his feet, his speech was slurred,
and his eyes were glassy and bloodshot.  James, who was naked
and in the bathroom when the officer arrived, seemed confused
about the officer's presence and admitted that he had been
drinking.  He eventually put on a pair of wet jeans.  The
officer determined that James posed a potential harm to himself
or others, placed him in protective custody, and drove him to
the station, where they arrived around 3:30 A.M.

throughout the station.  We have reviewed these recordings (videotapes); our narrative of the facts here includes not only the testimonial evidence at trial, but also what is shown and heard on the videotapes introduced at trial.  The facts are largely undisputed.

During booking, James reported that he had drunk six shots of alcohol during the evening, that he suffered from anxiety, that he had previously been treated for depression and for a nervous breakdown, and that he had thought about taking his life the day before but that he was not thinking of killing himself at the moment.  The booking officer told James that he would sleep at the station for a few hours and then be released. James was also told that he was not under arrest.  After being allowed to place a call to his mother, James was placed in a cell with a cup of water and a roll of toilet paper.  He was not given a blanket.  At some point, James took off his wet jeans and tried to cover himself with the toilet paper.

Shortly after 5 A.M., James, upset and apparently intoxicated, began banging on the door of his cell.  He repeatedly shouted that he wanted "his phone call" and the word "now."  He also made random reference to his father having voted for President Donald Trump.  An officer tried to calm James by noting that he had already been allowed to call his mother. After asking why James had removed his pants, and noting that he

was naked, the officer brought James a garment resembling a hospital gown, which he passed through a slot in the cell door. James subsequently fell asleep.

Shortly before 7 A.M., the defendant looked into James's cell and asked him why he had made "a mess of" himself, why he had no clothes on, where he lived, and whether he was under arrest or in protective custody (which James could not remember). The defendant said that he would check on James's status. He then asked where James had obtained the hospital gown, and suggested that James begin picking up the toilet paper that was strewn around the cell. James described his condition at this point as "sick" and still "very, very drunk."

Almost exactly thirty minutes later,[2] the defendant (wearing his uniform) returned carrying a small trash can and let himself into James's cell -- despite the fact that it was against department policy for an officer to go into a cell without a second officer present. The defendant and James began to pick up the toilet paper, and after additional inquiry into James's situation, the defendant told James that he could leave the cell to call his mother. James stood up, holding the hospital gown to cover himself. The defendant turned to face James, put down the trash can, and took the hospital gown away. James attempted

---

[2] The police department's protocol required that prisoners be checked every thirty minutes.

to cover his genitals with his hands and turned away from the defendant. In response, the defendant said, "No, it's all right. I've seen a prick before, trust me." James, scared, turned to face the defendant and moved his hands away from his genitals. The defendant then commented on James's penis, "Very nice, though. Uncut and everything, hunh. Good for you." James turned away from the defendant, who then gave the garment back to James and said, "All right, here, just wrap it around you then if you want, you can come out naked if you want to -- I'm just kidding." James wrapped himself in the gown and followed the defendant to the booking desk to call his mother.

The phone was located on the officer's side of the booking desk, which was approximately chest-high. The defendant went to the officer's side of the desk to dial the phone. Meanwhile, James stood up against the other side of the desk. After the defendant dialed the phone, he came out from behind the desk, stood a few feet from James, looked down at James's crotch, and said, "[V]ery nice." He continued to look at James until it was apparent that the phone call was not going to be answered. The defendant then returned behind the desk and hung up the phone. There followed a discussion about James's lack of clothes, and James asked for a blanket, which the defendant said he would get. The defendant came out from behind the desk and took the hospital gown away from James, again leaving him naked. James

again covered his genitals with his hands, and the defendant commented, "It's okay, you don't have to cover up. My God." In apparent reference to James's penis the defendant said, "I do like that, though. That's good. You don't have to be that modest. I mean, my goodness." After the defendant gave James a blanket, the defendant placed his hand on James's hip above his right buttock and steered him back to his cell. Once James was back in the cell, the defendant again engaged him in conversation, asking how his jeans had become soaked. At the end of this conversation, the defendant took James's jeans away.

About forty-five minutes later, again in violation of department policy, the defendant returned to James's cell alone. The defendant told James that his mother had called and had provided James's sister's phone number. The defendant stated that he would allow James to call his sister, but James (whose relationship with his sister was strained given the events described in note 1, supra) said that he would prefer to wait. The defendant then engaged James in a conversation about his tattoos during which the defendant moved close to James, and at one point touched James's forehead. When James asked to call his mother, the defendant led James back to the booking area.

The defendant dialed the phone and then handed it across the booking desk to James. James's mother did not answer, and James left only a short message. James then started to walk

back to his cell, but the defendant called him back and asked whether he wanted to call his sister.  James returned toward the desk and the defendant approached him, placed his hand on James's buttock, and then pressed his body against James as he (the defendant) dialed the phone.  After dialing the number, the defendant put his arm around James's waist and again placed his left arm on James's buttock, where he let it rest.

What happened as James then spoke on the phone with his sister is at the heart of this appeal, and so we set out separately James's testimony on the point as well as what is shown on the videotape.  James testified that the defendant "reached around, grabbed my penis and started massaging it and whispered in my ear 'Is this okay?'"  James responded, "[Y]es" because he was terrified and thought that he "wasn't going to get out" if he did not do what the defendant wanted.  James did not want the defendant to touch him, but he was afraid that if he did not allow the defendant to do so, he "was not going to have a good rest of the day," that the defendant could hurt him, and that a cry for help would be futile or result in his "getting beat up or charged on some trumped-up charges or kept in jail for no reason or worse, like raped."

The videotape shows the defendant moving his left arm from James's buttock and then running it around to the front of James's body.  At this point, the defendant was standing side by

side with James, and both men had their fronts facing the booking desk. After the defendant moved his left arm around to James's front, he asked, "Do you mind," to which James responded, "No." The defendant then said, "Can I go inside";[3] James said, "[C]old"; and the defendant again said, "Can I go inside." During this short exchange, the defendant turned his body so that he could reach James's penis with his right hand rather than his left.[4]

The defendant then massaged James's penis for two minutes while James spoke with his sister, asking her to come to the station and to bring him some clothes. At no point did James move away from the defendant or physically resist. At the same time, James kept the blanket tightly wrapped around him and gave no physical sign of encouragement, invitation, or participation.

Once James finished speaking with his sister, the defendant told James to follow him to a broom closet (which was not under video surveillance) and fellated James after he said "yes." Two minutes later, a sound in the booking area caused the defendant

---

[3] The Commonwealth contends that the defendant said "outside" the first time, but our careful review of the videotape leads us to conclude that the defendant said "inside" both times.

[4] We do not see any meaningful distinction between James's recollection that he said "yes" in response to an affirmatively-phrased question and the videotape's record that he said "no" to a negatively-phrased one. Linguistically, both expressed assent.

to "freak out," and he quickly left the broom closet to investigate. Seeing nothing, he returned to the broom closet, referring to "finishing off" James. After about eight and one-half minutes, James told the defendant to stop but, fearing the defendant would "do something" to him as a result, stated that he would not "tell on him" and "if he wanted to come back later he could," but that James "can't right now." The defendant returned James to his cell.

James's sister picked him up not long thereafter. On the ride home, James became hysterical, called his mother, and disclosed the events to her. Some days later, he reported them to the Salem police department.

The defendant was charged with rape and indecent assault and battery. The defendant neither testified himself nor called any witnesses on his behalf. Relying on James's testimony that he said "yes," and urging the jurors to assess the videotapes themselves, the defendant's consistent position at trial -- from

opening[5] through closing[6] -- was that James gave actual consent and was not so intoxicated that he could not do so.

We have set out in the margin the pertinent parts of the judge's instructions with respect to the indecent assault and

---

[5] Defense counsel stated in his opening:

"Mr. Butler says, 'May I go inside?'

"This 28-year-old male, whose level of sobriety you can figure out yourself, because you may not think he's intoxicated, he says something back. Again, you will hear it, whatever that word may be. We know from his conversation with the police it is 'Yes.' But it's followed by a phrase, something like 'cold.' And you can decide if there's a tone, a giggle, or a laugh. But whatever ambiguity you may have listening to that 'May I go inside?' response, Mr. Butler, who they want you to call guilty of rape, says again 'May I go inside?' 'May I go inside?' because he hasn't and he doesn't until [James] says yes.

"And for all the image of him there, the cold in his cell, and we all know that is terrible, the fact is that 28-year-old man next to this man, Mr. Butler, who from all of their prior interactions, you will see, has never raised his voice, never done anything, is not armed, does not threaten, does not verbally or physically coerce, you will hear he says yes . . . ."

[6] In closing, defense counsel stated:

"But [James], when he was given the question, chose to say yes. Not because he was coerced or intimidated. Not because it was a wise decision. Maybe his fog still existed. Bad choices get made.

"But it was a choice he made, conscious of his options. Conscious of his ability to exercise free will. There is nothing in the actual record of this case that shows otherwise. And to simply talk about the horrors of being raped doesn't substitute for the facts that exist."

battery charge.[7]  Among other things, the judge gave the mistake

of fact instruction recognized in Commonwealth v. Blache, 450

Mass. 583, 594 (2008),[8] which was limited to situations where the

---

[7] The judge instructed:

"The word 'indecent' is not a technical term, but rather a common word that may be assumed to be understood in its common meaning by an ordinary jury.  What is indecent should be measured [b]y common understanding and practices.  For example, the fondling of a person's breasts, touching his or her buttocks, or reaching between his or her legs may constitute indecent assault and battery.

". . .

"The Commonwealth must prove that at the time of the indecent assault and battery, the complainant did not consent.  You may consider evidence of the complainant's state of mind at the time of the alleged incident on the issue of consent.

"Now, a complainant is not required to use physical force to resist.  However, you may consider evidence of any attempt to restrain or confine the complainant, violence by the defendant, or struggle or outcry by the complainant on the issues of force and consent.

"However, lack of such evidence does not necessarily imply consent or the absence of force because in certain circumstances, physical resistance may not be possible.  For example, the complainant in a certain situation may not resist with force because of fear of bodily injury or because actual force was being applied to him or her.

"You may consider all of the circumstances and the entire sequence of events in determining whether the indecent assault and battery was without the complainant's consent and his ability to resist."

[8] The judge instructed:

ability to consent is impaired by drugs or alcohol.  But the judge refused to give the defendant's additional requested mistake of fact instruction, which was not limited to situations of impairment by drugs or alcohol, but rather sought to have the jury consider whether he had an honest and reasonable belief that the victim had consented to the indecent touching. Specifically, the defendant requested that the jury be instructed:

> "[I]t is the Commonwealth's burden to prove beyond all reasonable doubt that the Defendant would know that the Complainant did not consent to the acts of which [sic] are the basis of the indecent assault and battery charge alleged.  If from all the evidence, you

---

"If, because of the consumption of drugs and/or alcohol a person is so impaired as to be incapable of consenting to the touching, then any touching that occurred during such incapacity is without the person's consent.

". . .

"If you find that the Commonwealth has proved beyond a reasonable doubt that the complainant was so impaired as to be incapable of consenting as I have just described, and if you further find that the Commonwealth has proved beyond a reasonable doubt that the defendant knew or reasonably should have known that the complainant's condition rendered him incapable of consenting, then the Commonwealth has proved the element of lack of consent.

"In determining whether the Commonwealth has proved beyond a reasonable doubt that the defendant should have reasonably known that the complainant was incapable of consenting, you should examine whether a reasonable person, in the circumstances known to the defendant, would have known the complainant was incapable of consent."

See Blache, 450 Mass. at 594.

have a reasonable doubt whether the defendant[,] reasonably and in good faith, believed that [James] voluntarily consented to engage in the touching which [is] the basis of the indecent assault and battery charge, you must give the defendant the benefit of that reasonable doubt, and acquit him on that charge."[9]

During deliberations, the jury sent a note to the judge stating, "One of the jurors wants to know the legal definition of consent.  For example, can't give consent if drunk; or that are [sic] other circumstances?"  The judge and counsel discussed how to respond to the jury's note and concluded (with both parties' consent) to refer the jury back to the instructions previously delivered.

The jury acquitted the defendant of the rape charge, but convicted him of indecent assault and battery.  This appeal followed.

Discussion.  The defendant raises two issues on appeal. First, he argues that the judge erred in refusing to give his proposed mistake of fact as to consent instruction.  Second, he argues that the judge erred in excluding evidence that the victim was gay.  We examine each of these claims in turn.

1.  Mistake of fact as to consent.  The Supreme Judicial Court has stated that a mistake of fact as to consent defense "might, in some circumstances, be appropriate" in an indecent

---

[9] The defendant sought the same instruction with respect to the rape charge.

assault and battery case "where a defendant's claim of reasonable mistake of fact is at least arguably supported by the evidence" (citation omitted).  Kennedy, 478 Mass. at 810.  That said, the court has neither held nor implied that the defense is available in all indecent assault and battery cases.[10]  See id.

---

[10] Even in those States where the defense has been formally recognized, there are many circumstances in which appellate courts have ruled it is not required.

Alabama:  White v. State, 237 Ala. 610, 613 (1939) (where victim was of low intellect, no error to refuse instruction); Rhoden v. State, 49 Ala. App. 605, 609-610 (1973) (instruction not necessary where covered by other instructions).

Alaska:  Walker v. State, 652 P.2d 88, 92 n.7 (Alaska 1982) (waiver).

California:  People v. Williams, 4 Cal. 4th 354, 362 (1992) (evidence did not support giving instruction; instruction not necessary where theory of defense is actual consent); People v. Burnett, 9 Cal. App. 4th 685, 690-691 (1992) (instruction not necessary where defense was actual consent); People v. Simmons, 213 Cal. App. 3d 573, 579-581 (1989) (evidence regarding victim's conduct did not give rise to instruction and defendant did not testify); People v. Romero, 171 Cal. App. 3d 1149, 1156 (1985) (evidence did not rise to level requiring instruction and defendant did not testify); People v. Gonzalez, 141 Cal. App. 3d 786, 792-793 (1983) (same).

Connecticut:  State v. Jeffrey, 220 Conn. 698, 718-719 (1991) (instruction not necessary where defense was fabrication, not consent).

District of Columbia:  Bryant v. United States, 859 A.2d 1093, 1105-1106 (D.C. 2004) (evidence of victim's conduct did not support giving instruction).

Georgia:  Johnson v. State, 204 Ga. App. 369, 369 (1992) (judge did not err in refusing to give instruction as evidence did not permit construction that defendant had reasonable belief of consent).

Nor has it ever held in any particular case that the defendant was entitled to the defense in light of the facts and circumstances presented.[11]  See id. (defendant not entitled to mistake of fact instruction because facts did not warrant it).  See also Commonwealth v. Moran, 439 Mass. 482, 489-490 (2003);

---

     Indiana:  Boyd v. State, 564 N.E.2d 519, 522-523 (Ind. 1991) (evidence did not merit instruction); Tyson v. State, 619 N.E.2d 276, 295 (Ind. Ct. App. 1993) (instruction not merited where defense was actual consent).

     Missouri:  State v. Lint, 657 S.W.2d 722, 726-727 (Mo. Ct. App. 1983) (evidence did not support instruction).

     Nevada:  Honeycutt v. State, 118 Nev. 660, 671 (2002) (instruction not appropriate where there was evidence of threats, force, or coercion).

     New York:  State v. Williams, 81 N.Y.2d 303, 316-317 (1993) (evidence of force necessary for rape conviction precluded instruction).

     Oklahoma:  Green v. State, 611 P.2d 262, 265-266 (Okla. Crim. App. 1980) (where no evidence of consent, no instruction required); Bosin v. State, 565 P.2d 1061, 1065 (Okla. Crim. App. 1977) (same).

     [11] Moreover, except where the mistake of fact concerns the victim's capacity to consent, see Blache, 450 Mass. at 594, the mistake of fact defense has been rejected in sex offense cases. Thus, for example, because proof of force is required in rape cases, we do not recognize mistake of fact concerning the victim's consent as a defense in rape cases except to the extent recognized in Blache.  See Commonwealth v. Lopez, 433 Mass. 722, 728-729 (2001); Commonwealth v. Ascolillo, 405 Mass. 456, 463-464 (1989); Commonwealth v. Grant, 391 Mass. 645, 651 (1984). Also by way of example, we do not recognize mistake of fact concerning a victim's age as a defense to statutory rape. Commonwealth v. Miller, 385 Mass. 521, 525 (1982).

Commonwealth v. Lopez, 433 Mass. 722, 732 (2001); Commonwealth v. Ascolillo, 405 Mass. 456, 463 (1989); Commonwealth v. Cordeiro, 401 Mass. 843, 849-851 (1988); Commonwealth v. Grant, 391 Mass. 645, 650-651 (1984); Commonwealth v. Sherry, 386 Mass. 682, 697 (1982); Commonwealth v. Simcock, 31 Mass. App. Ct. 184, 191-192 (1991). Nonetheless, we begin with the premise that a mistake of fact as to consent defense may be available in cases of indecent assault and battery where "[t]he evidence, viewed as a whole, raise[s] the issue of honest and reasonable mistake." Simcock, 31 Mass. App. Ct. at 190. To understand whether the evidence did so here, we begin by examining the elements of indecent assault and battery on a person over the age of fourteen. We next examine the contours of the mistake of fact as to consent defense. Finally, we analyze whether the evidence fairly raised the defense such that the defendant was entitled to the instruction he requested.

"To prove indecent assault and battery on a person age fourteen or older, the Commonwealth is required to establish that the defendant committed an intentional, unprivileged, and indecent touching of the victim" without the victim's consent (quotation and citation omitted).[12] Kennedy, 478 Mass. at 810.

---

[12] Where the victim is under the age of fourteen, proof of lack of consent is not required, G. L. c. 265, § 13B; the defense, therefore, would never be at issue.

Indecent assault and battery is a general intent crime. Thus, although the Commonwealth bears the burden of proving the victim did not consent to the touching, it does not need to prove that the defendant intended that the touching be without consent. See Moran, 439 Mass. at 490; Simcock, 31 Mass. App. Ct. at 188. The Commonwealth need not prove the defendant's state of mind regarding the victim's consent, see Lopez, 433 Mass. at 727 ("Historically, the relevant inquiry has been limited to consent in fact, and no mens rea or knowledge as to the lack of consent has ever been required"); Cordeiro, 401 Mass. at 850 (rape); Grant, 391 Mass. at 650-651 (rape), except in the "special circumstances presented by a complainant who may have been incapable of consent," Blache, 450 Mass. at 599. Thus, although it is generally called a "defense," the defendant's state of mind as to the victim's consent is not truly a defense; instead, it negates an essential element of the crime. See Lopez, supra at 725 n.3. Nonetheless, for convenience, we refer to it here as a "defense" in a nontechnical way.

In some cases, such as this one, the defense will be grounded in the victim's actual consent. In these situations, the defendant is not claiming to be laboring under a mistake of fact as to whether the victim consented. Instead, the defense is that the defendant intended to -- and did -- act with the

victim's actual consent.[13]  In other cases, the defendant's state of mind is at issue because he claims that the victim's conduct was such that it led him to mistakenly and reasonably believe there was consent when, in fact, there was none.  In these types of cases, if there is evidence of "clear, objective indicia of nonconsent," then the defendant is not entitled to the defense. Kennedy, 478 Mass. at 811.  Instead, there must be substantial evidence of objective manifestations (i.e., the victim's conduct or words) of the victim's state of mind that are sufficiently equivocal to have "led a defendant to reasonably and in good faith believe consent existed where it did not."  Lopez, 433 Mass. at 731 n.5, quoting People v. Williams, 4 Cal. 4th 354, 362 (1992).

A mistake of fact as to consent defense focuses on a defendant's state of mind from both a subjective and objective viewpoint.  See Grant, 391 Mass. at 651 (mistake of fact is not "raised in the absence of evidence from which the jury could find that, although the victim did not consent, the defendant reasonably and in good faith believed otherwise"); Sherry, 386 Mass. at 697 ("The defense of mistake of fact . . . requires that the accused act in good faith and with reasonableness");

---

[13] The Supreme Judicial Court has suggested that, in declining to give a mistake of fact instruction, a judge may consider that the theory of defense was actual consent.  See Moran, 439 Mass. at 490.

Simcock, 31 Mass. App. Ct. at 189 ("A requirement for an instruction based upon one's actual mistake as to consent without regard to its reasonableness in the circumstances would be difficult to justify").  The subjective component requires evidence that the defendant holds an actual honest (sometimes called good faith) belief regarding the victim's consent.[14] "[T]he defendant's actual belief is most often, and most easily, raised by direct evidence in the form of the defendant's testimony. . . . However, a defendant is not required to testify or to present any evidence and may rely entirely on the Commonwealth's case to" fairly raise the issue of his subjective state of mind.  Commonwealth v. Toon, 55 Mass. App. Ct. 642, 650 (2002) (discussing self-defense).

The objective component requires that the defendant's actual belief be reasonable in the circumstances.  Grant, 391 Mass. at 651; Sherry, 386 Mass. at 697; Simcock, 31 Mass. App. Ct. at 189.  A judge may determine, as a matter of law, whether the facts sufficiently raise an issue of objective reasonableness.  Thus, for example, "[a] defendant who ignores a victim's clear and unambiguous pleas to stop does not raise a

---

[14] The dual requirement of subjective belief and objective reasonableness is not particular to the mistake of fact as to consent defense; it is also found in self-defense.  See Commonwealth v. Harrington, 379 Mass. 446, 450 (1980); Commonwealth v. Harris, 376 Mass. 201, 208 (1978).

legitimate claim of mistake of fact as to consent." Kennedy,
478 Mass. at 811. Likewise, proof of force "should negate any
possible mistake as to consent." Lopez, 433 Mass. at 729. See
Commonwealth v. Sherman, 481 Mass. 464, 475 (2019).

We now turn to the defendant's proposed instruction, which,
for convenience, we repeat here:

> "[I]t is the Commonwealth's burden to prove beyond all
> reasonable doubt that the Defendant would know that
> the Complainant did not consent to the acts of which
> [sic] are the basis of the indecent assault and
> battery charge alleged. If from all the evidence, you
> have a reasonable doubt whether the defendant
> reasonably and in good faith, believed that [James]
> voluntarily consented to engage in the touching which
> [is] the basis of the indecent assault and battery
> charge, you must give the defendant the benefit of
> that reasonable doubt, and acquit him on that charge."

The defendant was not entitled to the first sentence because it
was an inaccurate statement of the law. The Commonwealth is not
required to prove that the defendant intended the touching to be
without the victim's consent "or that [the defendant] had actual
knowledge of the victim's lack of consent." Ascolillo, 405
Mass. at 463; Cordeiro, 401 Mass. at 851 n.11.

We also conclude that the judge did not err in declining to
give the remainder of the defendant's proposed instruction.
Even accepting for the sake of argument that there was
sufficient circumstantial evidence to raise a question as to the

defendant's actual belief of James's consent,[15] the evidence taken as a whole did not raise an issue that the defendant's belief was objectively reasonable. The defendant, an experienced police officer, could be presumed to know that a person cannot be held in protective custody unless he is incapacitated and, therefore, that James was in fact incapacitated.[16] The power imbalance between the defendant and James should also be considered. The defendant was in charge of those in custody at the station. He controlled James's release from custody and James's ability to contact his family. He had taken away James's only clothing. By contrast, James, who was naked, was trapped at the station and completely dependent on

---

[15] Because the defendant did not testify, there was no direct evidence of his actual belief as to James's consent. In this unusual case, however, there was circumstantial evidence from which the defendant's state of mind could be inferred. Specifically, James testified (and the videotapes reflected) that James verbally assented to the defendant's request to "go inside." In addition, although James was not required to resist or physically rebuke the defendant, the absence of such physical resistance or rebuke, coupled with James's verbal assent, could give rise to an inference the defendant actually believed James had consented. See Toon, 55 Mass. App. Ct. at 651 (in absence of direct evidence, circumstantial evidence may serve as basis for inference as to defendant's actual state of mind).

[16] James was in protective custody, G. L. c. 111B, § 8, because he was incapacitated by alcohol. "'Incapacitated' [is] the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to suffer or cause physical harm or damage property, or (4) disorderly." G. L. c. 111B, § 3.

the defendant's help to leave.  There were no other officers around to whom James could appeal for help; the defendant made sure that he was alone with James and out of view of others.  In addition, the defendant manipulated James's vulnerability.  When James tried to return to his cell immediately before the indecent assault and battery occurred, the defendant called him back and then kept him there by giving him the opportunity to call his sister.  James, who needed his sister's help to get out of custody, was then essentially tethered to the booking desk by the phone cord while the defendant assaulted him.

Although it is true that James verbally assented to the defendant's question about "going inside," he testified that he did so because he was terrified and afraid of what might happen if he refused the defendant's advance.[17]  We have recognized "the particular power police officers -- or would-be police officers -- hold over ordinary citizens and the potential for abuse of

---

[17] We note that when police seek consent in other circumstances, such as to search or to take a person into protective custody, that consent must be voluntary.  See Ringuette v. Fall River, 888 F. Supp. 258, 268 (D. Mass. 1995) (consent to protective custody); Commonwealth v. Rogers, 444 Mass. 234, 237 (2005) (consent to search).  Thus, in the context of warrantless searches, the Commonwealth must prove "consent unfettered by coercion, express or implied, and also something more than mere acquiescence to a claim of lawful authority" (quotations and citations omitted).  Rogers, supra.  "Subtle coercion, in the form of an assertion of authority or color of office by the law enforcement officers may make what appears to be a voluntary act an involuntary one."  Id. at 246, quoting United States v. Griffin, 530 F.2d 739, 742 (7th Cir. 1976).

that power to compel submission to unwanted sexual advances with less resistance than they might otherwise encounter." Commonwealth v. Caracciola, 409 Mass. 648, 656 (1991). Moreover, the evidence showed at least one offensive touching on James's buttocks before the defendant asked his less-than-clear question about "going inside," and James's testimony also placed the touching before the request. Finally, James gave no physical indications of encouragement or invitation, and he was not required to resist.

Thus, although there was circumstantial evidence to support a finding that the defendant may have subjectively believed James had consented to the touching, the evidence taken as a whole did not fairly raise an issue that the defendant's belief was objectively reasonable.

Another consideration supports our conclusion that, on the facts presented here, any subjective belief the defendant harbored as to James's consent could not be objectively reasonable. In the closely-related situation of people held in correctional institutions, the Legislature has eliminated consent as a defense where a correction officer engages in sexual relations with an inmate. G. L. c. 268, § 21A. In such prosecutions, "an inmate shall be deemed incapable of consent." Id. Although the provisions of that statute are not binding here, they reflect a legislative judgment pertinent to assessing

the objective reasonableness of the defendant's belief as to James's consent in this case. It makes no sense to think that persons in police custody are any more capable of voluntarily consenting to sexual contact with their jailors than are inmates in correctional facilities. And we note that it would make good sense for the Legislature to correct this gap in legislation.

For all these reasons, we conclude that the judge did not err in declining to give the defendant's requested instruction regarding mistake of fact as to consent.

2. Exclusion of evidence of victim's sexual orientation. The judge correctly excluded evidence that James self-identified as gay on the ground that the evidence was not relevant. The defendant's argument that "it is more probable that a gay man would consent to the sexual advances of another man than a heterosexual man would" is unsupported by legal authority, citation, or logic.[18] A sexual assault victim's sexual orientation has no bearing on his or her consent regardless of whether he or she is heterosexual or homosexual. See Kvasnikoff v. State, 674 P.2d 302, 305-306 (Alaska Ct. App. 1983); People v. Murphy, 919 P.2d 191, 194-195 (Colo. 1996); People v.

---

[18] This is not a case where application of the rape shield statute would be in conflict with the "defendant's constitutional right to present evidence that might lead the jury to find that a Commonwealth witness is lying or otherwise unreliable." Commonwealth v. Polk, 462 Mass. 23, 38 (2012).

Hackett, 421 Mich. 338, 352-353 (1984).  Moreover, its admission was barred by the rape shield statute.  See G. L. c. 233, § 21B. See also Mass. G. Evid. § 412(a) (2019).

Judgment affirmed.